452 So.2d 1152 (1984)
SAVE OURSELVES, INC., et al.
v.
The LOUISIANA ENVIRONMENTAL CONTROL COMMISSION and The Louisiana Department of Natural Resources.
No. 83-C-1480.
Supreme Court of Louisiana.
May 14, 1984.
*1153 Stephen M. Irving, Baton Rouge, Atty. at Law, for plaintiff-applicant.
William J. Guste, Jr., Atty. Gen., Ian Douglas Lindsey, Asst. Atty. Gen., R. Gordon *1154 Kean, Jr., Charles S. McCowan, Jr., Sanders, Downing, Kean & Cazedessus, Baton Rouge, for defendant-respondent.
DENNIS, Justice.
We granted certiorari to review the lower courts' approval of permits issued by the Environmental Control Commission to IT Corporation for a major hazardous waste disposal facility on the Mississippi River. 430 So.2d 1114 (La.App.1983). This case raises issues intersecting the State Constitution's Natural Resource Article and the Louisiana Hazardous Waste Control Law; which is part of the Environmental Affairs Act of 1979. From the record presented for our review we cannot determine whether the agency followed correct interpretations of its constitutional and statutory duties, or whether its determinations are arbitrary, capricious or unreasonable. The judgments below are therefore vacated and the case is remanded to the court of appeal with directions to remand to the Environmental Control Commission for further proceedings consistent with this opinion.

I. Constitutional Provisions
It is the well settled law of this country that a state holds title to land under navigable waters within its limits and that the title is held in trust for the people of the state that they may enjoy and use the waters free from obstruction or interference. Illinois Central R. Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). A public trust for the protection, conservation and replenishment of all natural resources of the state was recognized by art. VI § 1 of the 1921 Louisiana Constitution.[1] The public trust doctrine was continued by the 1974 Louisiana Constitution, which specifically lists air and water as natural resources, commands protection, conservation and replenishment of them insofar as possible and consistent with health, safety and welfare of the people, and mandates the legislature to enact laws to implement this policy.[2] La. Const. art. IX § 1; Cf. Id. art. IX § 3; Gulf Oil Corp. v. State Mineral Board, 317 So.2d 576, 580 (1975) (on rehearing).

II. The Environmental Statutes
In implementation of the public trust mandate, the legislature enacted the Louisiana Environmental Affairs Act.[3] La.R.S. 30:1051 et seq. The stated purpose of the act is to maintain, protect and enhance a healthful and safe environment through regulation of water control, air quality, solid and hazardous waste, scenic rivers and *1155 streams, and radiation,[4] as well as to provide for comprehensive policies on a statewide basis to unify, coordinate, and implement programs for these purposes and for the most advantageous use of the resources of the state. La.R.S. 30:1053.
The Act establishes the Environmental Control Commission (ECC), within the Department of Natural Resources,[5] composed of seven cabinet level executive branch officials. La.R.S. 30:1062. The ECC is authorized to review on appeal the granting or denial by the secretary of the Department of Natural Resources of a permit for a hazardous waste facility, or to grant or deny a permit referred to it by the secretary. La.R.S. 30:1066. Any person aggrieved by a final decision or order of the commission may appeal to the proper court.[6]
Part VII of the Act is designated the Hazardous Waste Control Law. La.R.S. 30:1131-1149.1. The indicated purpose of the law is to assure that necessary safeguards and practices are adhered to on a continuing basis in matters pertaining to the transportation, treatment, storage and disposal of hazardous wastes, and thereby to prevent "substantial abuse of the environment," by establishing a framework for the regulation, monitoring, and control of generators, transportation, treatment, storage and disposal of hazardous waste. La. R.S. 30:1132. Hazardous waste is defined, in essence, as waste which significantly contributes to an increase in mortality or serious irreversible or incapacitating reversible illness, or as waste which poses a "substantial present or potential hazard to human health or the environment" when improperly treated, stored, transported, disposed of or managed. La.R.S. 30:1133(2). See also, Environmental Law, 39 La.L.Rev. 246, 251 (1978). The secretary, with the advice and cooperation of the Department of Health and Human Resources and the Department of Wildlife and Fisheries, is mandated to promulgate regulations for the identification and regulation of all hazardous waste treatment, storage and disposal facilities, "at a minimum" providing for: (1) Licensing or permit procedures for every facility; (2) Design, construction and operational standards which "will assure safe treatment, storage and disposal without substantial risk to the environment, water supplies, air and human health," including the submission of plans, designs, engineering reports, geological, hydrological, and other relevant data incidental to the determination of the suitability of an existing or a proposed facility; (3) Adequate record keeping of hazardous wastes managed; (4) Financial responsibility of regulated persons; (5) A Hazardous Waste Protection Fund; (6) Classification of Facilities; (7) Any other regulation necessary to administer or comply with federal or state law. La.R.S. 30:1141. (emphasis added)

III. The Regulations
Pursuant to legislative mandate, the Department of Natural Resources promulgated a body of regulations, entitled the Hazardous Waste Management Plan. (HWMP)[7] The two parts which concern us most in this case are those pertaining to the permit process and the standards for facilities which treat, store or dispose of hazardous waste.[8]
Permits must be secured by operators of facilities which treat, store, and/or dispose of hazardous wastes. HWMP, Rule 5.2.1. Generally, no facility may be used to treat, store or dispose of hazardous waste without a permit for the specific activities, procedures, *1156 and classification of waste handled as outlined in its permit. HWMP, Rule 5.2.2 B. No new facilities, or major modifications in existing facilities may be constructed without a permit, HWMP, Rule 5.2.2 C, or placed into operation until the facility is complete and (1) certified by the operator and an engineer as complete in accordance with the permit; and (2) inspected by the Department following a request to make final inspection by the operator. HWMP, Rule 5.2.2 D. A standard permit is issued for the projected life of the site. HWMP, Rule 5.2.4.
Upon acceptance of an application for review, copies are distributed for review and optional comment to: the public, a bulletin, a local newspaper, La. Water Pollution Control Division, La. Air Control Division, Department of Health and Human Resources, Department of Wildlife and Fisheries, Department of Transportation and Development, and local governing bodies. HWMP, Rule 5.3.1 A(7).
The Department evaluation will consider: (a) Purpose and use of facilities; (b) Operation and monitoring plan; (c) Capacity; (d) Closure; (e) Site Suitability; (f) Financial responsibility; (g) Legal Considerations; (h) Special considerations on a site specific basis; (i) Local zoning ordinances. 5.3.1 A(8).
A public hearing will be held for a permit for a commercial site and for any other facility if the Secretary determines it necessary. 5.3.1 A(10)-(11). Public hearings shall be conducted in accordance with the Administrative Procedure Act (La.R.S. 49:951 et seq.); HWMP, Rule 5.3.1 A(14).[9]
The permit application must include professionally exact and complete studies of (1) the site layout and facility design, showing all improvements and excavation; (2) Site geology; (3) Site hydrology, including surface flow, water wells, drainage, flood hazards, and climate factors; (4) Environmental factors; (5) Geographical factors; (6) Operations plan; (7) Closure plans; (8) Financial responsibility. HWMP, Rule 5.3.4.
All facilities which treat, store or dispose of hazardous waste must be constructed and operated to comply with the standards outlined in these regulations. HWMP, Rule 8.2.1. Site requirements include those pertaining to: geologyfor example, soils of low permeability over an entire area or other means providing a barrier to penetration of surface spills or erosion; geographyno facility in an overflow zone subject to hurricane or flood waters without site protection measures; hydrologynatural or artificial hydrological isolation required. HWMP, Rules 8.3.1 through 8.3.4.

IV. Interrelationship of Constitutional, Statutory and Regulatory Requirements
In summary, the Natural Resources article of the 1974 Louisiana Constitution imposes a duty of environmental protection on all state agencies and officials, establishes a standard of environmental protection, and mandates the legislature to enact laws to implement fully this policy. La. Const. art. IX § 1. In 1978 the legislature directed the Secretary of the Department of Natural Resources to promulgate regulations to prevent the transportation, treatment or disposal of hazardous wastes except by permit issued upon a showing that the particular project or facility to be licensed does not involve a substantial risk to the environment.[10]
The Environmental Affairs Act of 1979 expanded the 1978 statute and created the Environmental Control Commission and charged it with the responsibility of reviewing each application for a permit to determine whether the proposed project or facility complies with the constitutional and legislative standards. La.R.S. 30:1062, 1066.
The Constitutional standard requires environmental protection "insofar as *1157 possible and consistent with the health, safety, and welfare of the people." La. Const. art. IX § 1. This is a rule of reasonableness which requires an agency or official, before granting approval of proposed action affecting the environment, to determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Thus, the constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors.
The statutory standard requires environmental protection that "will assure safe treatment, storage and disposal [of hazardous wastes] without substantial risk to the environment * * *" La.R.S. 30:1141. Although it is possible to construe this provision as setting forth a higher standard of protection, reading the statute as a whole, we conclude that the legislative aim merely was to implement and perpetuate the constitutional rule of reasonableness.
The constitutional-statutory scheme implies several other important principles. Since the ECC, in effect, has been designated to act as the primary public trustee of natural resources and the environment in protecting them from hazardous waste pollution, it necessarily follows that the agency must act with diligence, fairness and faithfulness to protect this particular public interest in the resources. See W. Rodgers, Environmental Law § 2.16 (1977); 1 V. Yannacone & B. Cohen, Environmental Rights and Remedies § 2.1 et seq. (1972). Consequently, the commission's role as the representative of the public interest does not permit it to act as an umpire passively calling balls and strikes for adversaries appearing before it; the rights of the public must receive active and affirmative protection at the hands of the commission. Cf. Calvert Cliffs' Coord. Committee v. U.S. Atomic Energy Com'n, 449 F.2d 1109, 1119 (D.C.Cir.1971); Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620 (2d Cir.1965).
The environmental protection framework vests in the commission a latitude of discretion to determine the substantive results in each particular case. Environmental amenities will often be in conflict with economic and social considerations. To consider the former along with the latter must involve a balancing process. In some instances environmental costs may outweigh economic and social benefits and in other instances they may not. This leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. See Calvert Cliffs' Coord. Committee v. U.S. Atomic Energy Com'n, supra.
However, the environmental protection scheme also contains very important procedural provisions designed to see that the discretion entrusted to the ECC is in fact exercised in each individual case. The agency is required to use a systematic, interdisciplinary approach to evaluation of each hazardous waste project or facility. La.R.S. 30:1141. In determining whether the proposed project fully minimizes adverse environmental effects, the commission necessarily must consider whether alternate projects, alternate sites, or mitigative measures would offer more protection for the environment than the project as proposed without unduly curtailing non-environmental benefits. Cf. Calvert Cliffs' Coord. Committee v. U.S. Atomic Energy Com'n, supra.
This hazardous waste regulatory framework was modelled in part on the Resource Conservation and Recovery Act (RCRA) of 1976, 42 U.S.C. 6901 et seq., and includes features similar to those of the National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. 4321 et seq., and state environmental quality acts patterned after NEPA. See, e.g., The New York State Environmental Quality Review Act, 1975 N.Y.Laws ch. 612, codified at N.Y.Envtl. Conserv.Law art. 8 (McKinney Supp.1982-83); *1158 See, G. Levine, The New York State Environmental Quality Review Act of 1975: An Analysis of the Parties' Responsibilities in the Review/Permit Request Process, 12 Fordham Urb.L.J. 1 (1983-84); W. Rodgers, Environmental Law § 6.3 at 635, § 7.1 at 697 (1977). Consequently, federal and state cases interpreting those statutes may provide guidance in applying the Louisiana statutes. However, it should be kept in mind that the Louisiana regulatory framework is also based on state constitutional provisions and the public trust concept. La. Const. art. IX § 1. For general commentary on the public trust doctrine, see Rodgers, supra, at 170; J. Sax, The Public Trust Doctrine in Natural Resource Law, 68 Mich.L.Rev. 471 (1970); Comment, The Mississippi Public Trust Doctrine, 46 Miss. L.J. 84 (1975); Cf. Comment, The Public Trust Doctrine As A Basis for Environmental Litigation in Louisiana, 27 Loy.L.Rev. 469 (1981).

V. Scope of Review
Before considering the merits of relators' challenges to the permits, some mention must be made of the appropriate scope of review under the circumstances of this case. Generally, administrative agency adjudication is subject to judicial review under § 964 of the Louisiana Administrative Procedure Act (LAPA). In 1982, however, the Louisiana Environmental Affairs Act was amended to provide that the provisions of La.R.S. 49:962 and 964 shall not apply to decisions and orders of the commission. La.R.S. 30:1072 (1982 La. Acts No. 322). This change was part of a provision which now makes a final decision or order of the commission appealable to the Court of Appeal, instead of to the district court as provided by the LAPA. The change in the appellate forum for environmental cases appears to have been the only reason for making § 964 inapplicable to them. There is no substantial difference between the standards of review provided by § 964 and our own jurisprudential rules pertaining to judicial review. See, Central Louisiana Electric Co. Inc. v. Louisiana Public Service Com'n, 437 So.2d 278 (La. 1983); Florane v. Louisiana Public Service Com'n, 433 So.2d 120 (La.1983); Giallanza v. Louisiana Public Service Com'n, 412 So.2d 1369 (La.1982); South Central Bell Telephone Co. v. Louisiana Public Service Com'n, 352 So.2d 964 (La.1977) cert. den., 437 U.S. 911, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978); Baton Rouge Water Works v. Louisiana Public Service Com'n, 342 So.2d 609 (La.1977) cert. den., 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 86 (1977). Accordingly, since the use of the LAPA statutory scheme in environmental cases promotes clarity of analysis, we will continue to apply the standards of judicial review provided by § 964 by analogy.
Pursuant to § 964, a reviewing court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. La.R.S. 49:964 G.
Thus, § 964 establishes a multifaceted review function committed to the court. In the present context, for example, that function is divisible into four categoriesconstitutional or statutory, procedural, substantive and factual.
In reviewing an agency decision, a court must first determine whether its actions were "in violation of constitutional or statutory provisions", whether they were "in excess of statutory authority of the agency", or whether they were "affected by other error of law." La.R.S. 49:964 G(1)(2)(4). It must also consider whether the process used in arriving at the decisions afforded those affected their procedural *1159 due. La.R.S. 49:964 G(3). These first four grounds which justify judicial reversal or modification of an agency's decision involve evaluations of agency actions in light of established legal standards and raise traditional legal issues. R. Force and L. Griffith, The Louisiana Administrative Procedure Act, 42 La.L.Rev. 1227 (1982).
Less clear-cut are the provisions in § 964 G(5) and (6) which require judicial consideration of whether the agency "abuse[d its] discretion" (or was "arbitrary" or "capricious" or guilty of "clearly unwarranted exercise of discretion") in exercising the quasi-legislative authority delegated to it by the legislature or the constitution, or, on the other hand, whether its decision or finding was "manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record."
Due concern both for the intention of the constitution and the statute, and, more generally, for the boundaries between the legislative and the judicial functions, demands that a reviewing court exercise certain aspects of its review function with more circumspection than is appropriate to others. In light of the structure and aims of the public trust doctrine and the environmental act, and the breadth of authority delegated to the ECC, the judicial review function encounters significant limitations in the substantive aspects where the given statutory standards are "arbitrary", "capricious" or "abuse of discretion". It is elementary that a court's function is not to weigh de novo the available evidence and to substitute its judgment for that of the agency. Buras v. Board of Trustees of Police Pension, 367 So.2d 849 (La.1977) See, Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (D.C.Cir.1978); K. Davis, Administrative Law (1982 Supp.) at 536 et seq.
On the other hand, the constitutionalstatutory scheme, its history, intent and the nature of the duties it delegates to the agency and the judiciary, does not imply any derogation of the courts' traditional primacy in interpreting constitutional and statutory provisions and enforcing procedural rectitude. Benson & Gold Chev. v. Louisiana Motor Vehicle Com'n, 403 So.2d 13 (La.1981); Weyerhaeuser Co. v. Costle, supra, at 1027.
The regulatory scheme provided by constitution and statute mandates a particular sort of careful and informed decision-making process and creates judicially enforceable duties. Reviewing courts should not reverse a substantive decision on its merits, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental protection. However, if the decision was reached procedurally, without individualized consideration and balancing of environmental factors conducted fairly and in good faith, it is the courts' responsibility to reverse. Cf. Calvert Cliffs' Coord. Committee v. U.S. Atomic Energy Com'n, supra.
The manifest error test of § 964 G(6) is used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of agency discretion. Where there are no factual issues the manifest error test is not used. Insurance Serv. Office v. Commissioner of Insurance, 381 So.2d 515 (La.App. 1st Cir.1979); R. Force & L. Griffith, supra, at 1285.
The first sentence of § 964 G authorizes a reviewing court to remand the case for further proceedings. This court has held that for the purposes of judicial review, and in order to assure that the agency has acted reasonably in accordance with law, in a contested case involving complex issues, the agency is required to make basic findings supported by evidence and ultimate findings which flow rationally from the basic findings; and it must articulate a rational connection between the facts found and the order issued. Central Louisiana Electric Co. v. Louisiana Public Service Commission, 437 So.2d 278 (La. 1983), Giallanza v. Louisiana Public Service Commission, 412 So.2d 1369 (La. 1982); Cf. Dunlop v. Bachowski, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). This is particularly so in a case such as this *1160 where the agency performs as a public trustee and is duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute. Although we may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record, we will not supply a finding from the evidence or a reasoned basis for the commission's action that the commission has not found or given. Giallanza v. LPSC, supra; Baton Rouge Waterworks v. Louisiana Public Service Com'n, 342 So.2d 609 (La.1977); Cf. Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); 3 K. Davis, Administrative Law Treatise § 14.29 (1980) at 130.

VI. Lack of Reasons Preventing Review
We cannot determine from this record that the agency fully understood its function or properly exercised the discretion it has been given. The commission did not assign reasons for its decision, and its factual findings do not sufficiently illumine its decision-making process.
IT Corporation applied for and obtained permits to treat, store and dispose of hazardous wastes in connection with an $84 million facility it proposed to build on the Mississippi River near Burnside. The application was opposed before the agency and in the lower courts by Save Ourselves Inc. and other citizens, intervenor-objectors herein. Their challenge focused principally upon the applicant's proposal to construct a landfill pit for the disposal of treated industrial hazardous waste over three aquifers near the Mississippi River, allegedly endangering the water supply of the population nearby and down river, including that of the City of New Orleans.
IT presented witnesses who testified that IT's application complied with the HWMP standards for hazardous waste facilities. However, these witnesses did not testify that the adverse environmental effects of the facility had been avoided or minimized to the maximum extent possible. Moreover, none of the witnesses made a costbenefit analysis of the environmental and non-environmental factors to demonstrate that issuance of the permit would be compatible with the constitutional and statutory standard of environmental protection.
From the present record we cannot tell whether the agency performed its duty to see that the environment would be protected to the fullest extent possible consistent with the health, safety and welfare of the people. The record is silent on whether the agency considered alternate projects, alternate sites or mitigation measures, or whether it made any attempt to quantify environmental costs and weigh them against social and economic benefits of the project. From our review it appears that the agency may have erred by assuming that its duty was to adhere only to its own regulations rather than to the constitutional and statutory mandates.
On the other hand, the intervenor-objector introduced evidence and pointed out weaknesses in the applicant's case that were not rebutted by the applicant or explained away by the agency: The intervenors demonstrated that the applicant failed to locate and seal many of the water wells on, and within 2000 feet of, the site, presenting a possibility of existence of other unsealed wells allowing access for contaminants to aquifers from hazardous waste spills or flooding. The intervenors' expert witnesses testified that without full disclosure of the ingredients of the applicant's stabilization process, it could not be determined whether the clay liner of the landfill pit would withstand chemical reaction and breakdown for the life expectancy of the hazardous condition; the agency refused to require disclosure and did not explain why this does not raise a prima facie case of a substantial risk to the environment. The evidence introduced by both sides indicates that there is a significant possibility that the hazardous waste site is not hydrologically isolated as required by the regulations, but there is no indication *1161 that the agency determined whether this problem posed a substantial risk to the environment.
Further, the evidence in the record points to the possible need for mitigation measures which appear to have been rejected without sufficient reason by the agency: The testimony of witnesses for both the applicant and the intervenors indicates the need for a slurry wall as a second line of protection in addition to the clay liner around the landfill pit. Yet, the agency did not impose this as a condition to the permit. The permit does not limit the number or restrict the location of landfill pits which IT may build on its 1000 acre tract. Because the evidence indicates varying degrees of environmental risk associated with different portions of the property related to the possibility of unsealed wells or other pathways to the sub-strata, the flood plain, and proximity to the river, it would appear that the agency's failure to impose such restrictions may have been arbitrary, capricious and unreasonable.
Although the intervenor-objectors have not at this time persuaded us that the agency acted in violation of law, in excess of authority, or arbitrarily, capriciously or in abuse of discretion, we conclude that in order to obtain the judicial review to which they and the public are entitled, the commission must provide at least additional analysis and reasons for the agency decision. See Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); State of Maine v. Kreps, 563 F.2d 1043 (1st Cir. 1977). There is sufficient indication of possible misunderstanding on the commission's part of the constitutional and statutory requirements to render it improper for a court merely to rely on the presumptive correctness of the agency's bottom line result. State of Maine v. Kreps, supra. Cf. Giallanza v. Louisiana Public Service Com'n, supra; Baton Rouge Water Works v. Louisiana Public Service Com'n, supra.
"The administrative process will best be vindicated by clarity in its exercise." Phelps Dodge Corp. v. National Labor Relations Bd., 313 U.S. 177, 197, 61 S.Ct. 845, 853, 85 L.Ed. 1271, 1284. What was said in that case is equally applicable here: "We do not intend to enter the province that belongs to the board, nor do we do so. All we ask of the board is to give clear indication that it has exercised the discretion with which congress has empowered it. This is to affirm most emphatically the authority of the board."
As Justice Frankfurter stated in Securities and Exchange Com'n v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943): "In finding that the Commission's order cannot be sustained, we are not imposing any trammels on its powers. We are not enforcing formal requirements. We are not suggesting that the Commission must justify its exercise of administrative discretion in any particular manner or with artistic refinement. We are not sticking in the bark of words. We merely hold that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."
The cause should therefore be remanded to the court of appeal with directions to remand to the Commission for such further proceedings, not inconsistent with this opinion, as may be appropriate.
So ordered.
MARCUS, J., concurs.
NOTES
[1] La. Const. art. VI § 1 (1921): "The natural resources of the state shall be protected, conserved and replenished."
[2] La. Const. art. IX § 1: "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy."
[3] A chronology of the passage of applicable statutes and regulations is helpful to an understanding of this case. In 1978 the legislature charged the Department of Natural Resources with promulgating regulations to govern disposal of hazardous wastes. 1978 La. Acts No. 334. The regulatory plan enacted became effective on August 1, 1979. The regulations specified, inter alia, that the secretary of the DNR was charged with accepting or rejecting hazardous waste permits. In the Spring of 1979, prior to the effective date of the DNR's Hazardous Waste Management Plan (HWMP), the legislature passed the Environmental Affairs Act, La.R.S. 30:1051 et seq., 1979 La. Acts No. 449. The Act established a new regulator body within the DNR, the Environmental Control Commission, which was specifically charged with such duties as promulgating regulations, accepting and reviewing permit applications to operate hazardous waste facilitiesduties formerly exercised by the secretary of the DNR. The Environmental Affairs Act became effective January 1, 1980. Since IT submitted its application to dispose of hazardous wastes on April 5, 1980 it was subject to the HWMP as promulgated by the DNR, but necessarily modified by the more recent legislation. In 1983 the legislature amended the Act and renamed it the Environmental Quality Act. While we are cognizant of these recent amendments, citations in this opinion refer to the statutes in effect during the adjudications concerning IT's applications prior to the 1983 legislative actions.
[4] 1983 La. Acts No. 97 added scenic rivers and streams to this list.
[5] 1983 La. Acts No. 97 renamed this body the Department of Environmental Quality.
[6] Prior to 1982 an Environmental Control Commission order was appealable to the district court. 1982 La. Acts No. 322 amended La.R.S. 49:962 and 964 making a final decision or order of the commission appealable to the court of appeal.
[7] 1978 La. Acts No. 334.
[8] 1978 La. Act No. 334 dictates that regulations must be consistent, inter alia, with Pub.L. No. 94-580.
[9] Subsequently renumbered HWMP, Rule 5.2.6.
[10] 1978 La. No. Acts 334 § 1104 (indicating that the regulations be consistent, inter alia, with the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.).