506 So.2d 749 (1987)
Billy Dean BLACKETT, Gerald B. Iverson, and Killoden Land Company Partnership
v.
LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY and Browning Ferris, Inc.
No. CA 86 0179.
Court of Appeal of Louisiana, First Circuit.
April 14, 1987.
*750 Maureen N. Harbourt, Kean, Miller, Hawthorne, D'Armond, McCowan and Jarman, Baton Rouge, for appellant.
State of Louisiana, Dept. of Environmental Quality, Roland T. Huson, III, Gen. Counsel, Baton Rouge, for appellee.
Samuel O. Buckley, III, Susan Weidner, New Orleans, La., for B.F.I.
Before GROVER L. COVINGTON, C.J., and LANIER and ALFORD, JJ.
ALFORD, Judge.
This is an appeal from the granting of a standard solid waste disposal permit to Browning-Ferris Industries, Inc. (BFI) by the Louisiana Department of Environmental Quality (DEQ). Plaintiffs, Billy Dean Blackett, Jerry Iverson, and Killoden Land Company Partnership, own land in close proximity to BFI's proposed White Oaks Landfill in Ouachita Parish. They claim they will be adversely affected by the operation of the landfill and raise eleven assignments of error contesting DEQ's granting BFI a permit.

ASSIGNMENT OF ERROR NO. 1
Plaintiffs first contend that LSA-R.S. 30:1065(A) of the Louisiana Environmental Quality Act was not followed in the permit application procedure.
LSA-R.S. 30:1065(A), in pertinent part, requires that "prior to the grant of any permit, ... to any facility, each assistant secretary [of the DEQ] shall submit a report describing the history of violations and compliance for that facility." (emphasis added). Plaintiffs argue that since no such report was prepared for BFI's various operations in the state, the case should be remanded to DEQ for such report to be considered in the permit decision.
LSA-R.S. 30:1123(5) defines "solid waste disposal facility" as "any land area or structure or combination of land areas and structures, used for storing, salvaging, processing, reducing, incinerating, or disposing of solid wastes, excluding any `processing, treatment, or disposal facility' as defined *751 in R.S. 30:1133." (§ 1133 deals with hazardous waste facilities.)
Furthermore, LSA-R.S. 30:1054(14) defines "facility" as "a pollution source, or any public or private property or facility where an activity is conducted ... which does or has the potential to do any of the following: * * * (d) [t]ransport, process, or dispose of solid wastes." A pollution source is further defined in subsection (13) as "the immediate site or location of a discharge ..." (emphasis added.)
These definitions, along with the use of the term "facility" in LSA-R.S. 30:1065(A), indicate a singular facility is contemplated. Plaintiffs are thus incorrect in claiming a report must be prepared under LSA-R.S. 30:1065(A) for all facilities owned or operated by BFI within Louisiana.
White Oaks Landfill is a proposed facility. Since there can obviously be no violations or compliance history for a new facility, DEQ was not required to prepare the report described in LSA-R.S. 30:1065(A).
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
Plaintiffs next contend BFI was required to obtain a Louisiana Air Emissions permit under the Louisiana Emission Standards for Hazardous Air Pollutants, since BFI intends to dispose of asbestos, a designated hazardous air pollutant.
§ 6.3.6.A.4 of the Louisiana Solid Waste Rules and Regulations provides that "the following permits and other federal and state permits, when applicable must be applied for prior to the issuance of a solid waste disposal permit: ... (4) Louisiana Air Emissions Permit." (emphasis added).
In determining when an air emissions permit is applicable, it must first be ascertained what type of substance is involved. LSA-R.S. 30:1083(3)[1] defines hazardous air pollutants. LSA-R.S. 30:1089(A) requires the secretary to adopt and promulgate rules and regulations identifying hazardous air pollutants. Asbestos is governed by Part IV, Subpart F, § 81 of the Louisiana Air Quality Regulations.
§ 81.6 sets forth the requirements for disposal of asbestos-containing waste material. These requirements include prohibiting visible emissions, maintaining warning signs and fences, and covering the waste with non-asbestos-containing material.
BFI submitted in its permit application a Quality Assurance/Quality Control Plan for Asbestos. This plan states that the primary health objective in handling asbestos waste is preventing the release of asbestos-containing dust. It also sets forth specific policies and procedures for asbestos disposal management, such as a warning sign posted at the landfill's entrance, sufficient fencing and/or barriers to deter unauthorized entrance, and covering the waste with a minimum of three feet of asbestos-free trash followed by six inches of clean earthen material, or alternatively with one foot of clean earthen material. The plan provides additional information relative to packaging, personnel protection and hygiene, and training and informing employees.
BFI thus adequately met the requirements set forth in § 81.6 for asbestos disposal. An air emission permit is not applicable under § 6.3.6.A.4 of the Solid Waste Rules and Regulations.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
Plaintiffs further argue BFI did not submit sufficient evidence to show that White Oaks Landfill will be adequately isolated from sensitive environmental areas, such as the Russell Sage Wildlife Management Area.
The record reflects that the proposed landfill is separated from the wildlife *752 management area by Interstate 20 on the south and is located approximately one-half to one mile west of the management area.
§ 6.4.3.B.5 of the Louisiana Solid Waste Rules and Regulations requires environmental characteristics to be provided in a standard permit application. It specifically mandates a list of "all known historical sites, recreational areas, archaelogical sites, designated wildlife management areas, swamps and marshes, habitat for endangered species and other sensitive ecological areas within 1000' of site or as otherwise appropriate." It also requires to be provided "measures planned to protect such areas listed from detrimental impact from the operations at the site."
§ 7.3.1.C.1, under the standards governing processors and disposers of solid waste, sets forth the locational characteristics of site requirements. It provides that "sites located in, or adjacent to, swamps, marshes, estuaries, wildlife hatchery areas, habitat of endangered species, recharge zones, and similar critical environmental areas shall be isolated from such areas by effective barriers which eliminate probable adverse impacts on such area due to operation of the facility."
BFI's permit application shows that the Louisiana Department of Wildlife and Fisheries, Ecological Section, found "no environmentally sensitive areas or habitats located in the immediate proximity, or within 1000 feet of the selected site." The Department also expressed it had no objections to the proposed facility, "provided that all necessary precautions are taken, including construction of a levee and vegetative screening, as necessary, to insure minimal environmental impact to surrounding areas."
The transcript of the fact finding hearing held on August 12, 1985, in Monroe, Louisiana, outlines the precautions proposed by BFI. Perimeter berms or ledges would be built around the property. These berms would be constructed to a height to restrict visibility from the interstate and protect from flooding. BFI's permit application reflects that these levees would be grassed to minimize erosion. There would also be a holding pond for an oxidation basin in the southeast corner of the facility to collect potentially contaminated water for testing prior to discharge.
The record further reflects that the Louisiana Department of Culture, Recreation and Tourism reviewed the proposed site and found no significant cultural resources in the area.
The general principle governing judicial review of administrative decisions is that, if the evidence as reasonably interpreted supports the determination of an administrative agency, its orders are accorded great weight and will not be reversed or modified in the absence of a clear showing that the administrative action is arbitrary and capricious. Summers v. Sutton, 428 So.2d 1121, 1129 (La.App. 1st Cir.1983).
After a careful review of the record, we are of the opinion that DEQ took into consideration the safeguards and precautions relative to the wildlife management area. We cannot say its decision was arbitrary and capricious.
Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 4
Plaintiffs contend that the permit should not have been granted to BFI since its liability insurance coverage was scheduled to expire five days after the permit was issued.
§§ 6.4.3.I.3 and 7.3.2.D of the Solid Waste Rules and Regulations require that the owner/operator of a solid waste disposal facility maintain liability insurance during its operation. Operators of new facilities must submit evidence of such financial assurance at least sixty days before the date on which solid waste is first received for processing or disposal.
Although BFI's comprehensive general liability policy with Ranger Insurance Company was cancelled on October 26, 1985, BFI submitted evidence of new liability insurance coverage with National Union Fire Insurance Company on October 22, 1985. It therefore properly submitted evidence of financial assurance under the applicable *753 rules and regulations. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 5
Plaintiffs claim they timely requested and should have been granted an evidentiary hearing under LSA-R.S. 30:1072(A). They further argue that they were entitled to a rehearing under LSA-R.S. 49:959 of the Louisiana Administrative Procedure Act.
§ 6.4.1.E of the Solid Waste Rules and Regulations sets forth the permit application review process for existing and proposed processing and disposal facilities. It provides for giving public notice and soliciting public comments, and states that "[p]ublic [h]earings will be held for all new or existing facilities when the Assistant Secretary determines that a hearing is necessary based on comments received and other information."
DEQ, therefore, is not required to hold a hearing in every case. Rather, whether to conduct a hearing is within the Department's discretion. In the instant case, however, a public hearing was held in Monroe on August 12, 1985. Notice of the hearing was published and public comments were received and transcribed.
Plaintiffs here have no right to an additional hearing under LSA-R.S. 30:1072(A). This section states that a permit action is final unless "no later than twenty days after the notice of the action is served by certified mail or by hand upon the respondent, he files with the secretary a request for hearing." (emphasis added).
Although the permit was issued on October 21, 1985, and plaintiffs requested a hearing on October 31, 1985, only ten days later, this section of the statute does not apply to them. It clearly refers to only the respondent, or the one to whom a permit was issued or refused. This section is only applicable to BFI in this case. Plaintiffs' recourse is governed by Part C of the statute, which provides that "[a]ny person aggrieved by a final decision or order of the secretary may appeal therefrom to the Court of Appeal, First Circuit...."
The Louisiana Administrative Procedure Act is also inapplicable in this case. LSA-R.S. 49:955(A) of the act gives a right to a hearing only in an "adjudication." Hagood v. Pickering, 385 So.2d 405 (La.App. 1st Cir.1980), on remand, 392 So.2d 130 (La.App. 1st Cir.1980), writ denied, 405 So.2d 532 (La.1981). An adjudication is defined in LSA-R.S. 49:951(1) as an "agency process for the formulation of a decision or order." Subsection (3) of LSA-R.S. 49:951 defines "decision" or "order" as: "the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency, in any matter other than rulemaking, required by constitution or statute to be determined on the record after notice and opportunity for an agency hearing...."
When the definition of "adjudication" is read together with the definition of the included words "decision or order," it is clear a hearing is provided for only when the agency disposition is required by statute or constitution to be made after notice and opportunity for a hearing. The Administrative Procedure Act does not create an independent right to a hearing but merely sets forth the procedures to be used if the agency is obligated to hold a hearing by constitution or another statute. Hagood, 385 So.2d at 407-408.
It is clear in the instant case that a hearing was not mandated by statute or constitution but was in the discretion of DEQ. A public hearing was in fact held, however, as authorized by the Solid Waste Rules and Regulations.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 6-8 AND 10
These assignments of error involve essentially the same argument, that DEQ failed to develop an adequate record to support its permit decision.
The Louisiana Supreme Court, in Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984) (IT Decision), articulated five issues *754 to be addressed when reviewing an administrative record. First, have the potential and real adverse environmental effects of the proposed facility been avoided to the maximum extent possible? Second, does a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the proposed facility demonstrate that the latter outweighs the former? Third, are there alternative projects which would offer more protection to the environment than the proposed facility without unduly curtailing non-environmental benefits? Fourth, are there alternative sites which would offer more protection to the environment than the proposed facility site without unduly curtailing non-environmental benefits? Fifth, are there mitigating measures which would offer more protection to the environment than the facility as proposed without unduly curtailing non-environmental benefits?
A review of the record indicates these concerns were adequately addressed. BFI submitted in its comprehensive permit application specific responses to the issues raised by the IT Decision. The record also contains considerable correspondence between DEQ and BFI concerning the application and its requirements.
The record also expressly reveals that every comment raised at the public hearing and the subsequent written comments were evaluated before action was taken on the permit application. These concerns included the site's location in a flood plain, its close proximity to an airport, adverse economic and social impacts to the area, and increased traffic.

A. Flood Plain
The site requirements for processors and disposers of solid waste under § 7.3.1.B of the Solid Waste Rules and Regulations provide that "[f]acilities located in a floodplain... must be filled to bring site elevation above such flooding or otherwise protected by measures approved on a site specific basis." The record reflects that the flood plain issue was carefully evaluated as part of the permit application review process. The Regulations do not prohibit facilities from being located in flood plains but rather require that if located in flood plains appropriate protective measures be instituted.
BFI proposed to prevent drainage problems by constructing a levee system to be built to a height at least two feet above the 100-year flood level, digging perimeter drainage ditches, and building an on-site holding pond. The Corps of Engineers was contacted to determine the 100-year flood elevation at the site. DEQ expressed in the record its finding that BFI's permit application was in conformity with the Regulations. This concern was thus adequately addressed.

B. Airport
§ S7.3.1.C.5 prohibits solid waste disposal facilities from being "located within 10,000 feet of any public-use airport runway used by turbojet aircraft...." The BFI site is located 13,000 feet from the Monroe Regional Airport. § 6.5.1.A.6 mandates safety considerations for existing sites, including danger from birds attracted to the site in glide paths of aircraft. The record reflects safety concerns were evaluated and found to meet the applicable standards.

C. Economic and Social Impacts
BFI submitted a report in response to the IT Decision containing a cost benefit analysis of the environmental impacts balanced against the social and economic benefits. The report specifically noted the potential adverse environmental effects of the facility and described specific protective measures to be integrated into the design and operation of the landfill. The report focused on groundwater contamination, surface water contamination, air (odor and dust) contamination, and methane gas migration. Its conclusion was that the social and economic benefits outweigh the environmental impact costs, if any, of the proposed facility.
Environmental amenities will often be in conflict with economic and social considerations. To consider the former along with the latter must involve a balancing process. *755 In some instances environmental costs may outweigh economic and social benefits and in other instances they may not. This leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. Save Ourselves, Inc., 452 So.2d at 1157.
The Court then stated that a reviewing court "should not reverse a substantive decision on its merits, unless it can be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental protection." 452 So.2d at 1159. We cannot say DEQ's decision in this regard was arbitrary or capricious.

D. Traffic
§ 7.3.1.C.2 provides that access to the site "shall be by all weather roads ... with the capacity to accept the demands created by the facility and designed to avoid, to the extent practical, congestion, sharp turns, obstructions, or other hazards which are conducive to accidents."
The site location is immediately adjacent to Interstate 20 and is within one quarter mile of the I-20 and Highway 594 intersection. Concerns were raised as to increased truck traffic at this exchange.
We note that DEQ had issued a similar solid waste disposal permit to American Waste & Pollution Control, Inc., for a larger facility directly south of I-20, on Highway 594; access to that site was by the same exchange. Again, DEQ stated that these public comments were evaluated and considered in its decision.
The Louisiana Supreme Court has held that for the purposes of judicial review, and in order to assure that the agency has acted reasonably in accordance with law, in a contested case involving complex issues, the agency is required to make basic findings supported by evidence and ultimate findings which flow rationally from the basic findings; and it must articulate a rational connection between the facts found and the order issued. Save Ourselves, Inc., 452 So.2d at 1159.
However, the court may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record. 452 So.2d at 1160. While the administrative agency must articulate the basis for its decision, where the findings and reasons therefor are necessarily implicit in the record and the record readily yields substantial evidence to support the administrative determination, the administrative order is not invalid merely because of the agency's failure to make explicit its finding which was already self evident. Summers, 428 So.2d at 1128.
LSA-R.S. 49:955(E) specifies that the record in a case of adjudication shall include proposed findings. In addition, LSA-R.S. 49:958 requires that the final agency decision in an adjudication be in writing or stated in the record and include findings of fact and conclusions of law. However, as previously discussed, the granting of BFI's permit was not an adjudication since a hearing was not mandated by statute or constitution.
We find sufficient information is contained in the record or implied therefrom to meet the requirements of the IT Decision. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 11
Finally, plaintiffs claim DEQ did not adequately consider alternative sites or alternative measures to reduce the adverse economic, social and environmental impacts of the White Oaks Landfill.
In determining whether the proposed project fully minimizes adverse environmental effects, the agency necessarily must consider whether alternate projects, alternate sites, or mitigative measures would offer more protection for the environment than the project as proposed without unduly curtailing non-environmental benefits. Save Ourselves, Inc., 452 So.2d at 1157.
BFI did investigate four alternate sites, but plaintiffs claim they were all located "in virtually the same spot." A geotechnical *756 analysis of the soil was performed. DEQ argues that such soil suitable for landfills is often concentrated in a single location, due to natural clays sufficiently thick to inhibit the migration of leachate from the landfill. Again, we note the existence of another landfill already in the area.
We find DEQ did take into account alternate sites and mitigative measures in granting BFI's permit. This assignment of error is without merit.
In conclusion, we do not find that plaintiffs' substantial rights have been prejudiced because of DEQ's granting BFI a solid waste disposal permit. DEQ's findings, reasons and exercise of discretion are necessarily and clearly implied by the record. Accordingly, we affirm the final permit decision of the Louisiana Department of Environmental Quality that granted Browning-Ferris Industries, Inc. a solid waste disposal permit for White Oaks Landfill in Ouachita Parish. All costs of this appeal are to be paid by plaintiffs-appellants.
AFFIRMED.
NOTES
[1] "Hazardous air pollutant" means an air pollutant to which no ambient air standard is applicable and which causes or contributes to air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible illness, including cancer, and which are [sic] identified and listed pursuant to R.S. 30:1089(A).