Dear Representative Holden:
We are in receipt of your expedited opinion request regarding emergency rules recently adopted by the Secretary of the Department of Environmental Quality. You state that the Secretary has adopted a series of emergency rules over the course of the last six months under the emergency rule-making provision of the Administrative Procedure Act, R.S. 49:953B, citing possible economic loss to certain companies as the reason for adopting these emergency rules. In a telephone conversation for the purpose of clarifying our understanding of the opinion request, you gave as a particular example the recent emergency rules adopted by the Department of Environmental Quality dealing with produced water discharges.[1]
Specifically, you ask whether economic loss is a sufficient basis for a declaration of emergency by the Department of Environmental Quality.
As this office has stated in previous opinions, emergency rules which are adopted without strict adherence to the emergency rule-making provisions of the Administrative Procedure Act are null and void and unenforceable. In our opinion, the emergency rules at issue here were improperly adopted by the Department of Environmental Quality and are therefore invalid for the reasons set forth in those opinions[2] and discussed further below.
The emergency rules were adopted under Section 953B of the Administrative Procedure Act, which provides a mechanism for circumventing the normal rule-making process when there is "an imminent peril to the public health, safety, or welfare . . .," R.S. 49:953B(1). To circumvent the normal rule-making process, with all of the protections and safeguards granted to the public, the agency must include a "statement of its reason for finding it necessary to adopt an emergency rule [which] shall includespecific reasons why the failure to adopt the rule on an emergency basis would result in imminent peril to the public health, safety or welfare . . .," R.S. 49:953B(1).
Rules and emergency rules are essentially legislation. The Administrative Procedure Act is a judicially approved exception to the general rule that prohibits delegation of authority from one branch of government to another. Because the legislature has in essence delegated some of its law-making authority to the executive, legislative oversight of rule-making — and in particular emergency rule-making — is especially important. As this office has stated on page 4 of Opinion No. 90-226A:
 The public policy norm of the APA is the deliberate rule-making procedure of R.S. 49:953A with its features of notice, hearing and public participation. Emergency rule-making is the extraordinary exception to this norm . . . .
Opinion No. 90-226A further states:
 [T]he general and fundamental requirements of the Administrative Procedure Act . . . are to give fair notice to the public and an opportunity to be heard at a fair hearing, public purposes inherently safeguarded in the legislative process but which must be mandated by law in the executive equivalent of rule-making. Because the emergency rule-making process is extraordinary precisely because it dispenses with these fundamental safeguards of notice and hearing, the substantive grounds for its exercise are to be interpreted stricti juris . . . .
* * *
 The procedure effected by the Administrative Procedure Act is intended to provide an executive facsimile of the type of notice and hearing and public participation traditionally observed in the lawmaking process of the legislative branch of government. The legal incorporation of these safeguards into the rulemaking process restrains arbitrary, capricious or abusive exercises of power by executive officers and agencies.
 Notice to the public has been stated to be the core safeguard; a hearing facilitates notice, as well as an opportunity for public response. Dorignac v. Louisiana State Racing Commission, 436 So.2d 667 (La.App. 4th Cir. 1983).
 Attorney General's Opinion No. 90-226A, July 2, 1990, pages 1 — 3 (emphasis added)
In its declaration of emergency supporting adoption of the emergency rules, the Department of Environmental Quality, Office of Water Resources has stated in relevant part:
 [T]he Secretary of the Department hereby finds that imminent peril to the public welfare exists.
* * *
 Under current Louisiana regulations, most discharges of produced water from oil and gas production facilities must cease before January 1, 1997. For certain of these facilities, compliance with the prohibition on produced water discharges would require stopping production or the disposal of all produced waters. Either alternative could affect the public welfare through the loss of employment, loss of taxes, and loss of royalty revenues.
 The cost of disposal of produced water at permitted disposal facilities, along with the attendant costs of storage and transportation, could greatly reduce the net income generated by these production facilities. In many cases, the costs may be so great in relation to the revenue generated by the oil and/or gas production as to render continued operation impractical.
* * *
 Declaration of Emergency, Department of Environmental Quality, Office of Water Resources WP023E (emphasis added)
The notice requirements in the Department of Environmental Quality's declaration of emergency do not appear to meet the standards established by previous opinions issued by this office. Opinion No. 93-689, based on similar facts, states:
 This language absent other clarification appears insufficient, and for this reason the emergency rule is facially defective.
* * *
 An emergency rule rendered . . . without the inclusion of the facts justifying its issuance is invalid and unenforceable.
 Attorney General's Opinion No. 93-689, November 10, 1993, page 3.
The requirements of the notice of intent are further set forth in detail in Opinion No. 90-226A:
 The notice of intent to promulgate the emergency rule must justify its grounds. It must memorialize the grounds for the departure from the legislatively preferred procedure. Emergency rule-making is not an alternative to the procedure of R.S. 49:953A; it is an anomalous mode of executive action justified only by the two narrow sets of circumstances stated in R.S. 49:953B(1).
 Hence, for an emergency rule to have legal effect, the notice must state facts which if presumed true would constitute prima facie proof of one of the two grounds for emergency procedure under R.S. 49:953[B]. A legal conclusion that there is an imminent peril to the public health, safety or welfare will not suffice; the notice must state facts which if presumed true would establish the nature and existence of such peril. This failure is the first problem with the emergency rule.
 Attorney General's Opinion No. 90-226A, July 2, 1990, page 4 (emphasis added)
For the reasons set forth in the above opinions of this office, it is our opinion that the emergency rule is fatally defective because the declaration of emergency states no facts which constitute an emergency. In fact, the declaration of emergency states no facts at all, but merely states suppositions. The only basis advanced in support of the adoption of the emergency rule is couched in merely hypothetical terms: failure to adopt the rule "could affect the public welfare;" failure "could greatly reduce . . . net income;" and "costs may be so great . . . as to render continued production impractical." Such statements are suppositions only, not facts, and therefore cannot support adoption of an emergency rule. An emergency is not something thatmay happen or could happen; an emergency is something that is about to happen or has already happened.
It appears that the failure of the declaration is due at least in part to the failure of the agency to properly interpret the "imminent peril" provision of R.S. 49:953B(1). Again, we quote from Opinion No. 90-226A:
 [T]he agency [failed] to properly interpret "imminent." The facts stated in the emergency notice must reflect that one or both of the two harms which justify emergency rulemaking under R.S. 49:953B(1) will occur before regular rulemaking by normal procedure can result in an amelioration of the crisis. If there is no risk of federal sanctions being imposed before regular permanent rulemaking can be completed, with its full notice, hearing and public response facets, there is no legal cause for an emergency rule. The emergency rule is intended only to prevent one or both harms, peril to health, etc. or sanctions, from occurring before a regular rule can be adopted.
 An emergency rule is not a routine procedure for an executive agency to adopt to "fill the gap" until a regular rule is adopted. There must be an emergency, . . . .
 Attorney General's Opinion No. 90-226A, July 2, 1990, page 4 (emphasis in original)
Having given our opinion that the declaration of emergency is defective for failure to state facts which constitute an emergency, we wish to suggest an additional reason why the emergency rules require strict scrutiny. When an emergency environmental rule, as it does here, actually reduces
environmental protection, strict scrutiny and legislative oversight become particularly important. This is especially so considering the high standard of environmental protection placed on the Secretary of the Department of Environmental Quality by the constitution and statutes of the state of Louisiana. ArticleIX, Section 1 of the 1974 Louisiana Constitution states:
 § 1. Natural Resources and Environment; Public Policy
 Section 1. The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
1974 La. Const., Art. IX, Sec. 1 (emphasis added)
It should be noted that water is specifically listed as a natural resource which must be protected.
The natural resources article has been interpreted by the Louisiana Supreme Court in a landmark case, Save Ourselves, Inc.,et al. v. The Louisiana Environmental Control Commission,452 So.2d 1152 (La. 1984), as establishing a public trust for the protection of the environment:
 It is well settled law of this country that a state holds title to land under navigable waters within its limits and that the title is held in trust for the people of the state that they may enjoy and use the waters free from obstruction or interference. A public trust for the protection, conservation and replenishment of all natural resources of the state was recognized by art. VI, § 1 of the 1921 Louisiana Constitution. The public trust doctrine was continued by the 1974 Louisiana Constitution, which specifically lists air and water as natural resources, commands protection, conservation and replenishment of them insofar as possible and consistent with health, safety and welfare of the people, and mandates the legislature to enact laws to implement this policy.
* * *
 [T]he Natural Resources article of the 1974 Louisiana Constitution imposes a duty of environmental protection on all state agencies and officials, established a standard of environmental protection, and mandates the legislature to enact laws to implement fully this policy.
 Save Ourselves, Inc., et al v. Louisiana Environmental Control Commission, 452 So.2d 1152
at 1154, 1156 (emphasis added, citations and footnotes omitted)
In furtherance of this constitutional mandate, the legislature in 1979 enacted the Environmental Affairs Act, now known as the Louisiana Environmental Quality Act, R.S. 30:2001, et seq. In so doing, the legislature made certain findings and declarations with respect to the environment:
§ 2002. Findings and declaration of policy
The legislature finds and declares that:
 (1) The maintenance of a healthful and safe environment for the people of Louisiana is a matter of critical state concern.
 (2) It is necessary and desirable for the protection of the public welfare and property of the people of Louisiana that there be maintained at all times, both now and in the future, clean air and water resources, preservation of the scenic beauty and ecological regimen of certain free flowing streams, and strictly enforced programs for the safe and sanitary disposal of solid waste, for the management of hazardous waste, for the control of hazards due to natural and man-made radiation, considering sound policies regarding employment and economic development in Louisiana.
R.S. 30:2002 (emphasis added)
Again, it should be noted that the statute specifically requires the maintenance of clean air and water resources.
Included in the 1979 enactment of the Environmental Affairs Act, and maintained in the Environmental Quality Act, is the Louisiana Water Control Law, R.S. 30:2071 et seq. In Section 2072, the legislature set forth further findings and declarations with regard to water resources:
§ 2072. Policy; purpose
 The legislature finds and declares that the waters of the state of Louisiana are among the state's most important natural resource and their continued protection and safeguard is of vital concern to the citizens of this state. To insure the proper protection and maintenance of the state's waters, it is necessary to adopt a system to control and regulate the discharge of waste materials, pollutants, and other substances into the waters of the state.
R.S. 30:2072 (emphasis added)
In addition, the legislature has made the Secretary of the Department of Environmental Quality the primary public trustee of the environment,[3] and the Louisiana Supreme Court has stated that the Secretary must act affirmatively to protect the environment:
 The constitutional-statutory scheme implies several other important principles. Since the [Secretary], in effect, has been designated to act as the primary public trustee of the natural resources and the environment in protecting them from hazardous waste pollution, it necessarily follows that the agency must act with diligence, fairness and faithfulness to protect this public interest in the resource. Consequently, the [Secretary's] role as the representative of the public interest does not permit [him] to act as an umpire passively calling balls and strikes for adversaries appearing before it; the rights of the public must receive active and affirmative projection at the hands of the [Secretary].
 Save Ourselves, Inc., 452 So.2d at 1157 (emphasis added, citations omitted)
Thus we see that the people of the state, through their constitution, have established a public policy for the protection of the state's natural resources and environment, including water; that the supreme court has ruled that the natural resources article establishes a public trust for the protection of the environment and a duty of environmental protection on all state agencies and officials; and that the legislature, in furtherance of their mandate, has found that the maintenance of a healthful and safe environment is a matter of "critical state concern," that protecting and safeguarding the waters of the state is "of vital concern" to the citizens of the state; and that the legislature has made the Secretary of the Department of Environmental Quality the primary public trustee of the environment.
Given the high standard of environmental protection placed on the Secretary by the constitution, the legislature and the supreme court, and given that the emergency rules actually reduce
environmental protection, we believe that strict adherence to the emergency rule-making provisions of the Administrative Procedure Act is especially important. For this reason, and for the reasons set out above, we believe the emergency rules adopted by the Department of Environmental Quality were adopted improperly, and are thus invalid.
Trusting that we have satisfactorily answered your inquiry, I am
Sincerely,
 RICHARD P. IEYOUB Attorney General
 BY: _______________________________ IAN DOUGLAS LINDSEY Assistant Attorney General
RPI/IDL:llh Enclosures
[1] There are actually two emergency rules before us. Both grant an extension of time to achieve compliance with the prohibition against produced water discharges in fresh water areas and in intermediate, brackish and saline water areas inland of the territorial seas. The first emergency rule, WP023E, was adopted December 30, 1996. The second emergency rule, WP023E-A, adopted January 6, 1997, addresses an inadvertent omission in the first rule that resulted in a failure to provide an extension for discharges of produced water generated in territorial seas. A copy of both declarations of emergency is attached.
[2] Opinion Nos. 90-226, 90-226A and 93-689, copies attached.
[3] See R.S. 30:2014, 6th sentence: "The Secretary shall act as the primary public trustee of the environment . . . ."
 DECLARATION OF EMERGENCY
 Department of Environmental Quality Office of Water Resources Extension of Time to Achieve Compliance with Prohibition Against Produced Water Discharges in Freshwater Areas and in Intermediate, Brackish, and Saline Water Areas Inland of the Territorial Seas (LAC 33:IX.708.C) WP023E
In accordance with the emergency provisions of La. R.S.49:953(B) of the Administrative Procedure Act; which allow the Department of Environmental Quality (Department) to use emergency procedures to establish rules, and of La. R.S. 30:2011 and La. R.S. 30:2074, which allow the Department to establish standards, guidelines, and criteria to promulgate rules and regulations, and to issue compliance schedules, the Secretary of the Department hereby finds that imminent peril to the public welfare exists. Accordingly, the Department adopts the following emergency rule effective December 30, 1996, for one hundred twenty (120) days, or until promulgation of the final rule, whichever occurs first.
Under current Louisiana regulations, most discharges of produced water from oil and gas production facilities must cease before January 1, 1997. For certain of these facilities, compliance with the prohibition on produced water discharges would require stopping production or the disposal of all produced waters. Either alternative could affect the public welfare through loss of employment, loss of taxes, and loss of royalty revenues.
The cost of disposal of produced water at permitted disposal facilities, along with the attendant costs of storage and transportation, could greatly reduce the net income generated by these production facilities. In many cases, the costs may be so great in relation to the revenue generated by the oil and/or gas production as to render continued operation impractical.
As further basis for promulgation of this emergency rule, the Department finds the following:
State regulation of produces water
 • Many LWDPS permits have prohibited discharges of produced water beginning in 1988.
 • In March of 1991, state regulations were promulgated concerning produced water.
 • Certain facilities have been granted authority to discharge produced water for limited periods of time while working to eliminate all produced water discharges.
Federal regulation of produced water
 Federal general permit
 • NPDES general permit LAG290000 (published in the Federal Register on January 9, 1995, and effective February 8, 1995) prohibits produced water discharges to coastal waters with some exceptions.
 Federal administrative order
 • In conjunction with NPDES general permit LAG290000, the EPA issued an administrative order (also effective February 8, 1995) extending the time for compliance with the prohibition until January 1, 1997.
 Federal guidelines and standards
 • The most recently promulgated federal guidelines and standards that address produced water discharges were published December 16, 1996, at 61 Fed. Reg. 66085 (1996) (the federal guidelines).
 • The federal guidelines note at page 66122-23 the following:
 EPA received numerous comments form operators in the Gulf of Mexico coastal region claiming that they would need additional time to comply with the rule's zero discharge requirement for produced water. EPA recognizes that it may take some time for operators to determine the best and most cost effective mechanism of compliance and to implement that mechanism. EPA also recognizes that the NPDES permit issuing authority has discretion to use administrative orders to provide the requisite additional time to meet zero discharge.
 • The Department's Office of Water Resources became the NPDES permit issuing authority for the State of Louisiana on August 27, 1996.
 • The federal guidelines also note at page 66087 the following:
 The United States Department of Energy (DOE) has provided the State of Louisiana with comments and analyses suggesting a change to the Louisiana state law requiring zero discharge of produced waters to open bays by January 1997. Promulgation of [these 12/16/96 federal guidelines] would generally preclude issuance of permits allowing discharges.
Department of Energy study
 • The Department accepted information that was part of the DOE study referenced in LAC 33:IX.708.C.2.b.iv.(e), as documented at 61 Fed. Reg. 66087.
 • Even though the DOE study itself has not yet been completed, the Department and the EPA agree that study results would not change the produced water zero discharge requirement because the study's data and argument address water quality based limits and the federal guidelines are technology based.
Mitigating factors
 Various facilities have been unable to comply with the requirement to cease all discharges of produced water by January 1, 1997, because
 1. A number of facilities have applied to the Louisiana Department of Natural Resources (DNR) for permits to construct injection wells to receive the produced water that would otherwise be discharged. Due to a personnel shortage at DNR, all of the permit applications currently pending will not be processed prior to January of 1997.
 2. Facilities that discharge under the authority of LAC 33:IX.708.2.a.iv possess a valid LWDPS permit which allows continued discharge of produced water. With the publication of the federal guidelines on December 16, 1996, and upon the effective date of those guidelines (January 14, 1997), these dischargers will still possess a valid state permit which conflicts with promulgated federal guidelines requiring zero discharge.
 3. Certain facilities that previously had authority to discharge produced water relied upon the DOE study to support an individual or general permit or a rule change to allow the discharge of produced water. These facilities are now, with promulgation of the 1996 federal guidelines, required to attain zero discharge.
Conclusion
 The loss of employment, taxes, and royalties that would otherwise result, to detriment of the public welfare, can be avoided by allowing, on case-by-case basis, a limited amount of additional time for certain operators to either arrange an alternate method for disposal of their produced water or to cease production. This extension of time shall not extend the produced water discharge beyond January 1, 1999, except that an additional one-year extension may be granted to those facilities that discharge produced water generated in outer continental shelf waters into a major deltaic pass of the Mississippi River or to the Atchafalaya River, including Wax Lake Outlet below Morgan City. In no instance shall the Department approve a produced water discharge which would extend beyond January 1, 2000.
Adopted this 30th day of December, 1996.
 _______________________ J. Dale Givens Secretary
This public document was published at a total cost of $290.64.1255 copies of this public document were published at a total cost of $290.64. The total cost of all printings of this document, including reprints, is $290.64. The document was published by the Louisiana Department of Environmental Quality, P.O. Box 82282, Baton Rouge, LA 70884, for the purpose of informing the public of environmentally significant actions taken by the Secretary in accordance with the Administrative Procedure Act, R.S. 49:950-971 and/or R.S. 30:2001 et seq. This material was printed in accordance with the standards for printing by state agencies established pursuant to R.S. 43:31.
DECLARATORY OF EMERGENCY
 Department of Environmental Quality Office of Water Resources Extension of Time to Achieve Compliance with Prohibition Against Produced Water Discharges in Freshwater Areas and in Intermediate, Brackish, and Saline Water Areas Inland of the Territorial Seas (LAC 33:IX.708.C) WP023E-A
In accordance with the emergency provisions of La. R.S.49:953 (B) of the Administrative Procedure Act, which allow the Department of Environmental Quality (Department) to use emergency procedures to establish rules, and of La. R.S. 30:2011 and La. R.S. 30:2074, which allow the Department to establish standards, guidelines, and criteria, to promulgate rules and regulations, and to issue compliance schedules, the Secretary of the Department hereby finds that imminent peril to the public welfare exists and accordingly adopts the following emergency rule effective January 6, 1997 for one hundred twenty (120) days, or until promulgation of the final rule, whichever occurs first.
On December 30, 1996, the Department of Environmental Quality adopted an emergency rule, WP023E, which provided extensions of time to achieve compliance with prohibition against produced water discharges. An inadvertent omission in that rule resulted in a failure to provide an extension for discharges of produced water generated in territorial seas. The purpose of this emergency rule is to correct and supplement the original emergency rule to address the omitted category of produced water and other typographical errors.
All findings and specific reasons for issuance of this emergency rule are as stated in the WP023E Declaration of Emergency and are incorporated herein.
Adopted this 6th day of January, 1997.
 ______________________ J. Dale Givens Secretary