WHIPPLE, J.
| yThis matter is before us on appeal by plaintiffs, Louisiana All Star Baseball Corporation and Richard Brown (collectively *290 referred to as “LASB”), from a judgment of the district court affirming the decision of the administrative law judge in favor of defendant, the State of Louisiana through the Department of Revenue, Office of Charitable Gaming. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
LASB is a Louisiana nonprofit charitable organization registered as a 501(c)(3) corporation with the Internal Revenue Service. LASB’s stated mission is to enhance youth sports, particularly baseball, in the Baton Rouge community. LASB receives funding from the operation of charitable bingo games as a licensee under the Louisiana Charitable Raffles, Bingo and Keno Licensing Law, LSA-R.S. 4:701, et seq.
The Louisiana Legislature has recognized the state’s role and responsibilities in ensuring that the net proceeds from charitable games of chance conducted pursuant to Louisiana’s charitable gaming laws are contributed to bona fide charitable causes. LSA-R.S. 4:702(A). Further, pursuant to LSA-R.S. 4:702(B), “it shall be the policy of the State of Louisiana to decrease the potential for fraud in charitable games of chance and to increase compliance with the provisions of the Charitable Raffles, Bingo, and Keno Licensing Law and other applicable laws and regulations through monitoring and enforcement as well as public education and awareness of the purposes of these laws and regulations.” The Louisiana Department of Revenue, through its Office of Charitable Gaming, is charged with the regulatory authority and oversight of charitable gaming to ensure that the net proceeds of charitable games of chance are contributed to bona fide charitable causes. LSA-R.S. 4:702(A). The Office of Charitable Gaming is further charged with the duty to monitor licensees to ensure compliance with all ^provisions of law and regulations relative to charitable gaming through routine scheduled and unscheduled inspections and when warranted, investigations and audits. LSA-R.S. 4:705(6).
In accordance with this statutory authority, in 2007, an auditor with the Louisiana Department of Revenue, Office of Charitable Gaming (hereinafter referred to as the “OCG”) conducted a routine audit of LASB for the period of April 1, 2006, through March 31, 2007. As a result of the auditor’s findings, on November 19, 2007, the OCG issued a “Notice of Violation and Penalty Based on Audit Findings” to LASB, through its President, Richard Brown. The notice by the OCG set forth four specific audit findings in violation of the Louisiana Charitable Gaming Law by LASB, as follows: (1) inaccurate and incomplete session records; (2) practices by the licensee in violation of Treasury Regulation § 1.501(c)(3) in that the licensee’s net earnings in whole or in part were used to benefit private shareholders or individuals; (3) the receipt by the licensee’s members and/or members of their immediate family of either direct or indirect compensation and personal economic and financial benefit from the charitable gaining account in violation of LSA-R.S. 4:715(A)(2); and (4) the use by the licensee of net gaming proceeds in whole or in part for purposes other than educational, charitable, patriotic, religious or public-spirited purposes in violation of LSA-R.S. 4:735, LSA-R.S. 4:705(4) and (11), LAC 42:1.1783, and LAC 42:1.1787. Accordingly, the OCG imposed a fine of $100.00 for violations one and two and a fine of $500.00 for violations three and four. The OCG also attached a spreadsheet to the Notice of Violation, outlining therein the specific prohibited contributions discovered in the audit.
*291 LASB challenged the Department’s findings and a hearing was held before an administrative law judge (ALJ) on January 25, 2010. Prior to the hearing, the parties entered into a stipulation that LASB would pay a $100.00 fine as to the |4first violation set forth in the notice and that the OCG had dismissed the second violation. Thus, the matter proceeded to trial on the third and fourth violations set forth in the notice. After the hearing and the submission of post-trial briefs, in a decision rendered on February 17, 2010, the All agreed with the OCG and concluded that as to violation item three, LASB violated the provisions of LSA-R.S. 4:715(A)(2)(a) and imposed the recommended civil fine of $500.00.[1] The ALJ further concluded that as to violation item four, LASB violated the provisions of LSA-R.S. 4:735; thus, the ALJ likewise imposed the OCG’s proposed civil fine of $500.00.[2]
In support of the ruling and the imposition of penalties, the All rendered the following findings of fact:[3]
1
Pursuant to the Charitable Raffles, Bingo and Keno Licensing Law, LASB possesses a license to participate in Louisiana’s charitable gaming industry.
_k[2]
OGC completed an audit of LASB, auditing the period of April 1, 2006 through March 31, 2007.
3
On November 19, 2007, OCG issued a Notice of Violation and Penalty Based on Audit Findings asserting four violations by LASB of the Louisiana Charitable Gaming Laws and Rules.
4
Of the four alleged violations the parties stipulated to payment of a $100.00 fine for the first alleged violation and the second alleged violation was dismissed prior to the hearing.
5
Persons designated as members or Member-in-Charge of LASB are authorized to hold, operate, or conduct the games of chance permitted under LASB’s lieense[.]
6
Richard Brown was the President, Treasurer, Director, and Member-in-Charge of LASB during the period of the audit and is the father of [B.B.] and [L.B.]
7
LASB paid sports training and lessons fees for [B.B.] and [L.B.] that relieved Mr. Richard Brown from having to use his personal income for payment of those fees.
*292 8
One of the payments made by LASB was a “parental gift” of $380.00 to Catholic High School on behalf of [B.B.].
9
[B.C.] is the son of John and Susan Cryer and all three were members of LASB during the period of the audit.
10
[B.C.’s] summer sports training, fall semester expenses, food service costs, and spring semester expenses at the University of New Orleans were paid by LASB, that relieved John and Susan Cryer from having to use their personal income for payment of these expenses.
11
[C.E.] is the son of Randy Ernest. Randy Ernest was a member of LASB during the period of the audit.
12
[C.E.’s] college text books were paid for by LASB that relieved Mr. Randy Ernest from having to use his personal income for payment of these fees.
J¿3
Randy Ernest and his family’s travel expenses to Walt Disney World and stay at the Embassy Suites were paid by LASB.
14
[J.W., Jo.W., and Je.W.] are the minor children of Laurel Burroughs Wilson. Laurel Burroughs Wilson was a Member-in-Charge of LASB during the period of the audit.
15
LASB paid sports training and lessons fees for [J.W., Jo.W., and Je.W.] that relieved Laurel Burroughs Wilson from having to use her personal income for payment of these fees.
16
[K.W.] was a member of LASB during the period of the audit.
17
[K.W.’s] cheerleading expenses and physical rehabilitation expenses were paid by LASB that relieved her from having to use her personal income for payment of these fees.
18
[M.G.] and [T.G.] are the children of Tim Guidry. Tim Guidry was a member of LASB during the period of the audit.
19
LASB paid sports training and flight and hotel fees for [M.G.] and [T.G.] that relieved Mr. Tim Guidry from having to use his personal income for payment of these expenses.
20
Vicki Wall was the Vice-President, Director, and Member-in-Charge of LASB during the period of the audit.
21
LASB paid Vicki Wall for administrative, bookkeeping, and clerical work.
22
Lance Caraccioli was a member of LASB during the period of the audit.
23
Lance Caraccioli was paid by LASB to provide baseball coaching services.'
24
Joshua Wall was a member of LASB during the period of the audit.
1725
Joshua Wall was paid by LASB to provide baseball coaching services[.]
The ALJ also rendered “Conclusions of Law,” wherein the ALJ agreed with the OCG’s position that under the applicable statutory scheme, the first consideration, regardless of the ultimate use or purpose of the expenditure, is whether the payments at issue were made to a “bona fide charitable cause,” which the ALJ found did not occur herein.
*293 By petition filed on March 17, 2010, the LASB sought judicial review of the All’s decision in the Nineteenth Judicial District Court. Following briefing and argument, on November 8, 2010, the district court rendered oral reasons affirming the All’s decision. A written judgment in conforming with the district court’s oral reasons was signed on November 19, 2010.
LASB then filed the instant appeal, essentially contending that: (1) the district court’s finding that members or members of their family received direct compensation from charitable gaming proceeds is not supported by the evidence; and (2) that the district court applied an incorrect standard of law when it imposed the requirement that an organization’s contribution of charitable gaming proceeds made to a member or members of their family must be based on a showing that the individual is indigent or in need.
DISCUSSION
The petition for judicial review or appeal from an administrative proceeding involving a charitable gaming licensee shall be filed in the district court of the parish of the domicile of the licensee and judicial review shall be conducted by trial de novo and conducted by summary procedure. LSA-R.S. 4:737. The Administrative Procedure Act specifies that judicial review shall be confined to the record, as developed in the administrative proceedings. LSA-R.S. 49:964(F). Thus, the district court may reverse or modify the agency | ^decision if substantial rights of the appellant are prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the agency’s statutory authority; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary, capricious, or an abuse of discretion; or (6) manifestly erroneous. LSA-R.S. 49:964(G); See Devillier v. State, Department of Public Safety and Corrections, Public Safety Services, Office of State Police, Division of Charitable Gaming Control, Gaming Enforcement Section, 634 So.2d 884, 890 (La.App. 1st Cir.1993), writ denied, 635 So.2d 1101 (La.1994). The manifest error test is used in reviewing the facts as found by the administrative tribunal; the arbitrary and capricious test is used in reviewing the administrative tribunal’s conclusions and its exercise of discretion. Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152, 1159 (La.1984). On legal issues, the reviewing court gives no special weight to the findings of the administrative tribunal, but conducts a de novo review of questions of law and renders judgment on the record. See State Through Louisiana Riverboat Gaming Commission v. Louisiana State Police Riverboat Gaming Enforcement Division, 95-2355 (La.App. 1st Cir.8/21/96), 694 So.2d 316, 319.
ASSIGNMENT OF ERROR NUMBER TWO
For ease of discussion, we first address LASB’s second assignment of error and contention that the district court applied an “incorrect standard of law,” “when it ruled that an organization’s contribution of charitable gaming proceeds made to a member or member of their family must be based on a showing that the individual is indigent or in need,” which precondition LASB argues, is not a requirement found in the applicable statutes. LASB further argues that while the ALJ found the contributions at issue were not for bona fide charitable causes ^pursuant to LSA-R.S. 4:702, the contributions were nonetheless made for educational uses as authorized by LSA-R.S. 4:707(0, and, accordingly, *294 should have been upheld as proper.[4]
As set forth above, the stated purpose of Louisiana’s Charitable Gaming Law is to ensure that the net proceeds of such games are contributed to bona fide charitable causes. LSA-R.S. 4:702(A). Moreover, the OCG has authority to license charitable organizations, such as LASB, to “participate in such games and ... conduct the games accordingly when the entire net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, religious, or public spirited uses.” LSA-R.S. 4:707(C).
Herein, the ALJ made the specific finding that “[pjretermitting whether the payments were for an educational purpose, there was no evidence that any of the payments were made to bona fide charitable causes.” The ALJ agreed with the OCG’s position, as reflected in the testimony of Michael Legendre, the Director of the OCG, that in accordance with Louisiana Law, before any of the five permissible uses set forth in LSA-R.S. 4:707 are considered, the OCG’s first consideration is (and, in accordance with statute, must be) whether the payments are made to a bona fide charitable cause as required by LSA-R.S. 4:702. The OCG determined through the audit that the contributions at issue were made for the personal benefit of members and family members of members. Mr. Legendre further testified that the Notice was issued in accordance with the position of the OCG that “the organization’s purpose is to benefit communities and civic associations alike and not individuals of the organization.”
| inHeather Crotwell, the OCG auditor in this case, similarly testified that if a contribution is made to a member or for the direct benefit of a member or family member of a member, it is not a charitable donation and cannot be cloaked as “educational.” Ms. Crotwell stated that the purpose of charitable gaming is to allow charitable 501(C)(3) organizations to be able to make money to benefit their charity and to follow the mission as stated in their by-laws and articles of incorporation. Her audit revealed that the expenditures and contributions at issue were not charitable in nature in that individual LASB members and individual family members of LASB members reaped the benefits of the net gaming proceeds at the will of the organization with no showing of need or merit. She also stated that there was no evidence of any contributions to teams in the community.
After considering all of the testimony and evidence, the ALJ agreed with the OCG that such expenditures were required by law to be made to “bona fide charitable causes,” and concluded that there was no evidence that the so-called “educational” contributions were made to “bona fide charitable causes.” On review, the district court affirmed the ALJ’s factual findings and legal conclusions. In doing so, the district court reasoned that to accept LASB’s contention, ie., that as long as a contribution is for an “educational purpose,” it is permissible under the act, would completely ignore the declared purpose of the act as set forth in LSA-R.S. 4:702, which is that net proceeds of chari *295 table gaming can only be contributed to a bona fide charitable cause. We agree.
The starting point for interpretation of any statute is the language of the statute itself. Raudo v. Anco Insulations, Inc., 2008-1163 (La.5/22/09), 16 So.3d 1065, 1075. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law is applied as written, and no further interpretation may be made in search of legislative intent. LSA-C.C. art. |1¶9. However, when the language of a law is susceptible to different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. LSA-C.C. art. 10. The Louisiana Supreme Court, elaborating upon this principle, stated in Fruge v. Muffoletto, 242 La. 569, 137 So.2d 336 (1962):
In construing a statute, the primary object is to ascertain and, if possible, give effect to the intention and purpose of the legislature as expressed in the statute. Since the meaning is to be determined from a general consideration of the act as a whole, all parts, provisions or sections must be read together; each must be considered with respect to, or in the light of, all the other provisions, and construed in harmony with the whole. The intent as deduced from the whole will prevail over that of a particular part considered separately. Meaning should be given, if possible, to each and every section, and the construction placed on one portion should not be such as to obliterate another; so, in determining the meaning of a word, phrase or clause, the entire statute is to be considered.
In sum, LSA-R.S. 4:707 must be read and construed with the entire statutory scheme of the charitable gaming laws as a whole, including the stated purpose therein. Considering that the purpose of the charitable gaming laws, as clearly declared in LSA-R.S. 4:702, is to ensure that the “net proceeds of charitable games of chance ... are contributed to bona fide charitable causes,” to the extent, if at all, that LSA-R.S. 4:707 and LSA-R.S. 4:702 conflict, as contended by LASB, we are required to give effect to the intention and purpose of the legislature as expressed in the statute. Thus, we find no error in the district court’s decision to affirm the All’s ruling, as there was no evidence presented to show that the contributions at issue were made in accordance with the threshold legal requirement that such payments be made to bona fide charitable causes.
Accordingly, we find no merit to this assignment of error.
| ^ASSIGNMENT OF ERROR NUMBER ONE
We also find no merit in LASB’s remaining assignment of error, i.e., that the district court’s finding that members or members of their family received direct compensation and personal economic financial benefit is not supported by the evidence.
The charitable gaming laws provide that members that hold, operate, or conduct any licensed game or games of chance shall receive “no commission, salary, compensation, reward, or recompense ... directly or indirectly.” LSA-R.S. 4:715(A)(2)(a). Rather, member payment for working games of chance “shall be no more than ten dollars per hour and in any event shall not exceed fifty dollars per session ... [and] shall be subject to the reporting provisions of R.S. 4:716.” LSA- *296 R.S. 4:715(A)(2)(b).[5] Violations of the provisions of the charitable gaming rules and regulations are punishable by civil penalty imposed by the CGO. LSA-R.S. 4:735(A).
As noted by the ALJ and the district court, the evidence and undisputed testimony establishes in detail the numerous instances, as discerned through the audit, in which LASB members and family members of LASB members who worked bingo games and provided other services for LASB received recompense in the form of sports training fees, lessons, equipment, uniforms, physical therapy |1sand rehab services, travel flight and hotel expenses, college tuition, food, and book expenses, coaching services, etc. Moreover, in one particular instance, a parental contribution was made by LASB on behalf of an LASB member and his wife, in the name of the member’s son, to their son’s high school.
LASB argues, however, that the payments at issue were “donations” and did not serve as compensation for working bingo games in violation of LSA-R.S. 4:715(A)(2)(a). In support, LASB notes that the OCG Auditor Crotwell testified that she did not render a specific audit finding tying the services rendered or the work for a specific service to a specific donation or contribution.
Contrariwise, OCG counters that the audit review of LASB’s membership roster, bingo payroll, and other documentation for the audit period revealed that the members or family members of members who received these significant contributions performed work for LASB, but did not receive payment for their services rendered. Thus, although the OCG auditor testified that she did not render a specific finding tying the services rendered or the work for a specific service to a specific donation or contribution, the fact that LASB members worked and received no compensation or salary, but at the same time received significant contributions for themselves or their immediate family, evidenced a general intent to allow such contributions to indirectly compensate members for services rendered. Accordingly, OCG maintains the particular contributions at issue herein, made to members or family members of members that had worked for LASB, constituted payment in violation of LSA-R.S. 4:715(A)(2)(a).
In its oral reasons, the district court noted that “these payments were, in fact, compensation, reward, or recompense made in violation of [LSA-R.S. 4:]715(A)(2).”[6] The district court further found:
*297 | i4[T]he record clearly supports the finding of the administrative law judge that members of the organization and/or their immediate family members did receive a direct compensation and personal economic financial benefit from the charitable gaming account, that being proceeds, net proceeds, from the games of chance, in violation of R.S. 4:715(A)(2), and that All Star Baseball used net gaming proceeds in whole or in part for uses other than that allowed by 702(A) in violation of 735(9).
Considering the record and the applicable the law herein, we find no error in the judgment of the district court.
This assignment of error also lacks merit.
CONCLUSION
For the above and foregoing reasons, the November 19, 2010 judgment of the district court is affirmed. All costs of this appeal are assessed against the plaintiffs/appellants, Louisiana All Star Baseball Corporation and Richard Brown.
AFFIRMED.
GUIDRY, J., concurs in the result.

. Louisiana Revised Statute 4:715(A)(2)(a) provides that:
No commission, salary, compensation, reward, or recompense, including but not limited to granting or use of bingo cards without charge or at a reduced charge, shall be paid or given directly or indirectly to any person holding, operating, or conducting any licensed game or games of chance.

. Louisiana Revised Statute 4:735 provides, in pertinent part, as follows:
A. Any person, association, or corporation which violates any provision of this Chapter including the specifically enumerated acts contained in Subsection B of this Section or any rule or regulation of the office shall be subject to a civil penalty imposed by the office as further provided in R.S. 4:721 and to suspension or revocation of its license as further provided in R.S. 4:705.

.Considering the nature of these proceedings and the ALJ’s factual findings, we have used initials when referring to the minors identified in these matters.

. in support of the contention that the district court applied the incorrect standard of law, LASB notes that in discussing whether the contributions made by LASB were made to bona fide charitable causes, the district court observed that none of the recipients of these contributions were "indigent or in need.” Considering the district court's reasons for judgment in their entirety, we find no merit to this claim, as the record shows that despite this casual observation by the district court in the course of its ruling, the court clearly applied the correct standard of review when determining the issues herein.

. Louisiana Revised Statute 4:715(A)(2)(b) provides:
Any person, association, or corporation licensed to hold, operate, or conduct any games of chance under any license issued pursuant to this Chapter may compensate, for services rendered, any fifteen employees, including a bingo caller, who assist in the holding, operating, or conducting of such games. The rate of compensation shall be no more than ten dollars per hour and in any event shall not exceed fifty dollars per session for any employee. Each employee or volunteer worker may also be provided meals and beverages to be eaten on the premises not to exceed a total value of fifteen dollars per person. Expenditures made under the provisions of this Subsection shall be subject to the reporting provisions of R.S. 4:716. Compensation provided for in this Paragraph shall not constitute a violation of the prohibition against the payment or giving of a commission, salary, compensation, reward, or recompense to any person holding, operating, or conducting any such game.

. While we are sympathetic to LASB’s argument that prohibition of the type of contributions at issue herein may discourage parent members to serve as volunteers, we agree with the district court that “just because a person volunteers to help or becomes a member doesn’t automatically mean they're entitled to receive a portion of the net proceeds *297 from charitable gaming without any further showing of compliance with both 702 and 707.” Moreover, we note that although LASB has not paid members for working bingo games and providing other services in the past, LASB parent members who volunteer to work at the charitable games of chance can take advantage of member payment through the procedures set forth in LSA-R.S. 4:715(2)(b) and while furthering LASB’s mission of encouraging members to be involved with their child.