# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**25-551 consolidated with 25-552**

**HEALTHY GULF, ET AL.**

**VERSUS**

**SECRETARY, LOUISIANA DEPARTMENT OF NATURAL RESOURCES**

**Consolidated with 25-552**

**HEALTHY GULF, ET AL.**

**VERSUS**

**SECRETARY, LOUISIANA DEPARTMENT OF NATURAL RESOURCES**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NUMBER 1021076
CONSOLIDATED WITH 1021077
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**CLAYTON DAVIS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Charles G. Fitzgerald, Gary J. Ortego, and Clayton Davis, Judges.

**AFFIRMED.**

**Myles Ranier**
**Broussard Knoll Law Firm**
**1301 Common Street**
**Lake Charles, Louisiana 70601**
**(337) 439-2450**
**myles@broussardknoll.com**
**COUNSEL FOR PLAINTIFFS APPELLANTS:**
> **Healthy Gulf For A Better Bayou**
> **Fishermen Involved in Sustaining Our Heritage**
> **Habitat Recovery Project**
> **Louisiana Bucket Brigade**
> **Micah 6:8 Mission**
> **Sierra Club**

**Elizabeth Livingston de Calderon**
**Michael L. Brown**
**Bridgett McCoy**
**Earth Justice**
**900 Camp Street, Unit 303**
**New Orleans, Louisiana 70130**
**(504) 910-1712**
**ecalderon@earthjustice.org**
**mlbrown@earthjustice.org**
**bmccoy@earthjustice.org**
**COUNSEL FOR PLAINTIFFS APPELLANTS:**
> **Healthy Gulf For A Better Bayou**
> **Fishermen Involved in Sustaining Our Heritage**
> **Habitat Recovery Project**
> **Louisiana Bucket Brigade**
> **Micah 6:8 Mission**
> **Sierra Club**

**Kirk A. Patrick, III**
**Dylan A. Thompson**
**Donahue, Patrick & Scott PLLC**
**450 Laurel Street, Suite 1600**
**Post Office Box 1629**
**Baton Rouge, Louisiana 70801**
**(225) 214-1908**
**patrick@dps-law.com**
**dthompson@dps-law.com**
**COUNSEL FOR AMICUS CURIAE:**
> **James Steven Broussard**
> **Cheryl Kim Broussard**
> **J.S. Broussard Farms, LLC**

**David A. Peterson**
**Richelle N. Moore**
**Louisiana Department of Justice**
**Post Office Box 94005**
**Baton Rouge, Louisiana 70821**
**(225) 326-6000**
**Petersond@ag.louisiana.gov**
**MooreR@ag.louisiana.gov**
**COUNSEL FOR DEFENDANT APPELLEE:**
**State of Louisiana, Department of Energy and Natural Resources**

**Blake Canfield**
**Morgan D. Rogers**
**Louisiana Department of Conservation and Energy**
**Post Office Box 94396**
**Baton Rouge, Louisiana 70804**
**(225) 342-0572**
**Blake.Canfield@la.gov**
**Morgan.Rogers2@la.gov**
**COUNSEL FOR DEFENDANT APPELLEE:**
**State of Louisiana, Department of Energy and Natural Resources**

**Pamela R. Mascari**
**Troy J. Charpentier**
**Lauren J. Rucinski**
**Kean Miller LLP**
**400 Convention Street, Suite 700**
**Baton Rouge, Louisiana 70821**
**(225) 387-0999**
**Pam.Mascari@keanmiller.com**
**Troy.Charpentier@keanmiller.com**
**Lauren.Rucinski@keanmiller.com**
**COUNSEL FOR APPELLEES/INTERVENORS:**
**Venture Global CP2 LNG, LLC and**
**Venture Global CP2 Express, LLC**

**Tod Everage**
**Kean Miller LLP**
**909 Poydras Street, Suite 3600**
**New Orleans, Louisiana 70112**
**(504) 585-3050**
**Tod.Everage@keanmiller.com**
**COUNSEL FOR APPELLEES/INTERVENORS:**
**Venture Global CP2 LNG, LLC and**
**Venture Global CP2 Express, LLC**

**Maureen N. Harbourt**
**Venture Global LNG, Inc.**
**400 Convention Street, Suite 500**
**Baton Rouge, Louisiana 70821**
**(225) 937-5274**
**mharbourt@venturegloballng.com**
**COUNSEL FOR DEFENDANTS APPELLEES:**
    **Venture Global CP2 LNG, LLC and**
    **Venture Global CP2 Express, LLC**

**DAVIS, Judge.**

Healthy Gulf and six other plaintiffs[1] appeal the ruling of the district court affirming the Department of Natural Resources, Office of Coastal Management's (OCM) decision to grant coastal use permits to two Venture Global limited liability companies for the construction and operation of a liquefied natural gas liquefaction, storage and export complex, and pipeline system in Cameron and Calcasieu parishes. For the following reasons, we affirm OCM's permit grants.

## FACTS AND PROCEDURAL HISTORY

Venture Global seeks to build infrastructure in Louisiana's coastal zone to export liquified natural gas to the global market. The coastal zone is defined by statute, includes all of Cameron Parish, and extends north to Sulphur, Louisiana.

The Venture Global companies applied for coastal use permits from OCM. One permit was to construct a liquefied natural gas terminal; the other was for a pipeline to supply it. The terminal project seeks to construct a 737-acre natural gas liquefaction, storage, and export terminal adjacent to the Calcasieu ship channel in Cameron Parish. The pipeline project anticipates constructing eighty-five miles of pipeline and a forty-acre compressor station to connect the terminal project to an existing pipeline system in Texas. Forty-five miles of this pipeline would pass through the coastal zone. The project will affect large areas of wetlands and have negative environmental impacts.

Venture Global is required to mitigate unavoidable permanent impacts to vegetated wetlands. The project, however, will yield significant economic benefits to Cameron Parish and the State of Louisiana. Venture Global estimates that the project will provide $540 million in construction worker payroll over a four-year

---

[1]We refer to these plaintiffs collectively as "Healthy Gulf" and refer to the plaintiff group in the singular.

period, with the State collecting $75 million in sales tax from the project workforce. It believes the state will collect around $24 million in income tax revenue during the construction period.

Venture Global presented various alternative sites in its permit applications for OCM's consideration along with extensive environmental and storm surge analyses. OCM approved both projects and issued two coastal use permits in March 2024.

The Federal Energy Regulatory Commission (FERC) conducted a parallel review of these proposed projects. OCM relied on FERC's work in arriving at its decision to issue permits. FERC concluded that "approval of the proposed project, with the mitigation measures recommended . . . would have some adverse environmental impacts; however, all of these impacts would be reduced to less-than-significant levels."

As "person[s] adversely affected by a coastal use permit decision," Healthy Gulf appealed the permit decision to the district court in Cameron Parish where the project is primarily located. La.R.S. 49:214.30(D). The district court affirmed the issuance of the permits.

## STANDARD OF REVIEW

The State and Local Coastal Resources Management Act governs both the issuance and judicial review of coastal use permits. La.R.S. 49:214.30, 214.35. Louisiana Revised Statutes 49:214.35(F) refers to the Louisiana Administrative Procedure Act for additional rules of review. The relevant part of this Act, at La.R.S. 49:978.1(G), explains:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review.

Here, "[t]he scope of our appellate review is defined by the same sections of the Administrative Procedure Act [La.R.S. 49:978.1(G)] as those for the district court, the first court of appellate review." *Davis v. State Bd. of CPA,* 13-514, p. 7 (La.App. 4 Cir. 12/18/13), 131 So.3d 391, 396.

At first glance, sections (G)(5) and (G)(6) supply overlapping, inconsistent standards. However, the jurisprudence has clarified this:

> Louisiana Revised Statutes 49:964(G)(5) and (6) [now redesignated as La.R.S. 49:978.1(G)(5) and (6)] address different considerations. Louisiana Revised Statutes 49:[978.1](G)(5) "is used in reviewing conclusions and exercises of agency discretion," thus, this provision applies to questions of law and mixed questions of fact and law. Robert Force & Lawrence Griffith, *The Louisiana Administrative Procedure Act,* 42 La. L.Rev. 1227, 1285–86 (1982). Distinctly, [La.R.S. 49:978.1(G)(6)] "is used in reviewing the facts as found by the agency," which, according to the statute provision, includes credibility determinations. *Id.*

*Carpenter v. State, Dept. of Health and Hosps.*, 05-1904, p. 5 (La.App. 1 Cir. 9/20/06), 944 So.2d 604, 608. Consequently, the arbitrary and capricious standard applies to an agency's decision to issue or deny permits, but the "supported and sustainable by a preponderance of evidence" standard applies to the agency's factual findings, factual inferences, and credibility determinations. The jurisprudence has

also called this preponderance of evidence standard a manifest error standard. *Save Ourselves, Inc. v. La. Env't*, 452 So.2d 1152 (La.1984); *see also Holladay v. La. State Bd. of Med. Exam'* 961740 (La.App. 4 Cir. 2/19/97), 689 So.2d 718, *writ denied,* 97-730 (La. 5/1/97), 693 So.2d 740. Regarding the arbitrary and capricious standard, arbitrary means an abuse of discretion and a decision that disregards evidence or its weight, while a capricious decision is one whose conclusion is contrary to the evidence or is not supported by any substantial evidence. *Carpenter*, 944 So.2d 604.

Additionally, a significant body of jurisprudence addresses the deference to be given to an administrative agency's decision. However, the legislature recently amended La.R.S. 49:978.1 to specifically bar deference to an agency's interpretations of statutes or rules. Louisiana Revised Statutes 49:978.1(H) now states:

> In interpreting a state statute or rule, a court, administrative judge, or hearing officer presiding over a contested case, hearing, or appeal shall not defer to the agency's interpretation of the statute or rule. The court, administrative judge, or hearing officer shall interpret the meaning of the statute or rule de novo.

As a procedural clarification, the change is retroactive.

The Louisiana Supreme Court has previously found "[i]t is elementary that a court's function is not to weigh de novo the available evidence and to substitute its judgment for that of the agency." *Save Ourselves*, *Inc.,* 452 So.2d at 1159. However, this "does not imply any derogation of the courts' traditional primacy in interpreting constitutional and statutory provisions and enforcing procedural rectitude." *Id.* In the past, some appellate courts have refused to defer to an administrative agency when it failed to comply with regulations or guidelines. *Pardue v. Stephens*, 558 So.2d 1149 (La.App. 1 Cir. 1989). This jurisprudence does not conflict with the Legislature's deference amendment.

4

Previously jurisprudence stated "[c]onsiderable weight should be given to an administrative agency's construction and interpretation of its rules as provided for under the statutory scheme that the agency is assigned to administer." *See Healthy Gulf v. Sec'y, La. of Nat. Res.*, 24-286, p. 6 (La.App. 4 Cir. 12/23/24), 407 So.3d 705, 711. However, Louisiana Revised Statutes 49:978.1(G) specifically overrules this. Thus, we must defer to an agency's weighing of the facts and its conclusion (here to issue permits) unless, after our independent review, the agency has misinterpreted the governing law and guidelines.

## STATE AND LOCAL COASTAL RESOURCES MANAGEMENT ACT AND PERMIT GUIDELINES

The State and Local Coastal Resources Management Act of 1978, La.R.S. 49:214.21 et seq., declared the State's public policy to be to protect the coastal zone's resources and to support economic growth. Healthy Gulf claims OCM's decision violated La.R.S. 49:214.27 because it failed to consider Venture Global's plan to construct and operate both a compressor station and a carbon capture and storage system (CCS) as part of the project.

However, this statute only states that the secretary shall develop a coastal management program, including laws and regulations for the coastal zone. It does not include any guidelines. It mandates the creation and implementation of guidelines and specifies their goals. These goals not only include environmental protection and minimizing impacts on coastal resources but also "[r]ecognize the value of . . . areas particularly suited for industrial [or] commercial . . . development and manage those areas to enhance their value to the people of Louisiana." La.R.S. 49:214.27(4).

Louisiana Administrative Code, title 43, Pt. I, § 701, contains the guidelines that complement the State and Local Coastal Resources Management Act. It states:

5

G. It is the policy of the coastal resources program to avoid the following adverse impacts. To this end, all uses and activities shall be planned, sited, designed, constructed, operated, and maintained to avoid to the maximum extent practicable significant:

. . . .

2. adverse economic impacts on the locality of the use and affected governmental bodies;

. . . .

5. destruction or adverse alterations of . . . wetland, . . . waterbottoms, beaches, . . . and other natural biologically valuable areas or protective coastal features;

. . . .

10. adverse effects of cumulative impacts;

. . . .

16. adverse alteration or destruction of . . . valuable habitats . . . ;

. . . .

20. increases in the potential for flood, hurricane and other storm damage, or increases in the likelihood that damage will occur from such hazards[.]

Subparagraph H of Louisiana Administrative Code, title 43, Pt. I, § 701 states

that if the:

[maximum extent practicable modifier] is not complied with, the use will be in compliance with the guideline if the permitting authority finds, after a systematic consideration of all pertinent information regarding the use, the site and the impacts of the use as set forth in Subsection F above, and a balancing of their relative significance, that the benefits resulting from the proposed use would clearly outweigh the adverse impacts resulting from noncompliance with the modified standard and there are no feasible and practical alternative locations, methods, and practices for the use that are in compliance with the modified standard and:

a. significant public benefits will result from the use; or

b. the use would serve important regional, state, or national interests, including the national interest in resources and the siting of facilities in the coastal zone identified in the coastal resources program.

Also, the Administrative Code requires that the agency evaluate "locations, designs, methods, practices, and techniques which may be required, following a thorough review of [the guidelines], to avoid and minimize" adverse impacts and to restore impacted sites. La.Admin.Code. tit. 43, Pt. I, § 724(B)(1)(a-c). The Code requires mitigation as a condition to granting a permit when the activity causes a "net loss of coastal resources ecological value that is anticipated to occur despite efforts to avoid, minimize, and restore permitted/authorized impacts[.]" La.Admin.Code. tit. 43, Pt. I, § 724(B)(1)(c). If the permit applicant applies for and is issued a variance, mitigation is not required. *Id*.

Healthy Gulf also alleges that OCM violated La.Const. art. 9, § 1, which states:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

## ASSIGNMENT OF ERROR

With this background, we now go to Healthy Gulf's single assignment of error, which is that the district court erred in affirming OCM's decisions. Healthy Gulf argues that OCM violated the Coastal Zone Act and the related guidelines in the Administrative Code by failing to:

> 1) consider the pipeline's compressor station and an integrated CCS system in its decision to issue the permit;
>
> 2) find whether alternative sites prohibited approval because they would have avoided more coastal zone impacts;
>
> 3) weigh the costs to fishermen from increased ship traffic blocking access to waterways and fishing grounds; and
>
> 4) meet its public trust duty under La.Const. art. 9, § 1 to give "full and careful consideration" to environmental, social, and economic costs.

7

## ANALYSIS

**1. Did OCM fail to consider the pipeline compressor station and integrated carbon capture system in its permit decision?**

Healthy Gulf argues that OCM failed to meet its statutory obligations under La.R.S. 49:214.27 and its regulatory obligations under La.Admin.Code. tit. 43, Pt. I, § 701. They claim OCM did not apply the coastal use guidelines for the project's compressor station and carbon capture system and failed to make findings on either. Also, it argues that the flood wall constitutes a "levee" under the coastal use guidelines, triggering additional analysis under more specific guidelines governing levees. If these elements of the project were ignored entirely, any cost benefit analysis without them would be inaccurate.

OCM's "Basis of Decision" included the compressor station as part of the pipeline project. OCM considered concerns made at the public hearing and throughout the permitting process that the proposed site used gas powered generators instead of electric ones. The "Basis of Decision" says full and fair consideration was given to these concerns and comments.

OCM noted that the proposed project "shall be in conformance with all applicable water and air quality laws, standards and regulations." The decision mandates that Venture Global obtain any other permits required by the Louisiana Department of Environmental Quality before beginning construction. In the FERC analysis upon which OCM relied, FERC found that the compressor station "would not cause or contribute to any cumulative significant impact level . . . exceedances for [National Ambient Air Quality Standards] . . . ." FERC found that an "electric motor-driven compression at the Moss Lake Compressor Station would not provide a significant environmental advantage over or equivalent reliability to the proposed

8

gas-powered . . . compression, in part due to the unpredictable reliability of electric power transmission during severe weather events, including hurricanes."

In addition, OCM addressed the wetlands impact of the compressor station. OCM required Venture Global to mitigate for lost acreage and noted that Venture Global had already purchased wetland mitigation credits, which "purchases will satisfy the requirements for compensatory mitigation and allow permittee to conduct the activities authorized under this permit."

Likewise, OCM addressed the air quality and noise impacts of the compressor station by incorporating the Final Environmental Impact Statement (FEIS) performed by FERC as part of its obligation under the National Environmental Policy Act. The FEIS conclusion was that the project would "not result in significant impacts of air quality" and "would not result in significant impacts on nearby residents of noise sensitive areas."

Regarding the carbon capture facility, the Louisiana Department of Conservation and Energy's Office of Permitting, Underground Injection Control Section, governs the permitting of such wells. *See* La.R.S. 30:1101, *et seq*. Regardless, such technologies are intended to mitigate environmental harm, and their inclusion would seem to bolster OCM's decision to grant the pipeline project a permit.

Healthy Gulf also takes issue with OCM's finding that the concrete storm surge protection wall around the compressor station was not a levee and did not trigger the levee guidelines. The Administrative Code defines levees as:

> any use or activity which creates an embankment to control or prevent water movement, to retain water or other material, or to raise a road or other lineal use above normal or flood water levels. Examples include levees, dikes and embankments of any sort.

La.Admin.Code. tit. 43, Pt. I, § 700.

The Code defines levees broadly but does not specifically mention storm surge walls. The types of water controls mentioned are typically constructed adjacent to bodies of water or waterways. Common usage of the term embankment does not typically contemplate a concrete wall surrounding a complex of industrial equipment, so it was reasonable for OCM to conclude that the project did not include any levees. The relevant parts of the specific guidelines governing levees state:

> D. Hurricane and flood protection levees shall be located at the nonwetland/wetland interface or landward to the maximum extent practicable.
>
> . . . .
>
> F. Hurricane or flood protection levee systems shall be designed, built and thereafter operated and maintained utilizing best practical techniques to minimize disruptions of existing hydrologic patterns, and the interchange of water, beneficial nutrients, and aquatic organisms between enclosed wetlands and those outside the levee system.

La.Admin.Code. tit. 43, Pt. I, § 703.

OCM reviewed extensive hydrology and storm surge reports submitted by Venture Global. The "Basis of Decision" states that as part of its hydrologic modification impact analysis, based on the information submitted, the "project would have little or no negative impact of the local hydrology," and the "hydraulic modification resulting from the project did not adversely impact the quantity, movement, distribution and quality of water within the watershed." The OCM further found that the "proposed activities are not anticipated to increase the risk of flooding to the project area or areas surrounding the project."

Venture Global submitted detailed plans and analyses for the components of the pipeline project. FERC analyzed the compressor station, and OCM adopted the analysis. In applying the guidelines, the "Basis of Decision" speaks of the pipeline project more generally rather than piecemeal. But given the full context, OCM considered the compressor station in its analysis. As the Louisiana Supreme Court

has stated, "we may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record." *Save Ourselves, Inc.,* 452 So.2d at 1159. Consequently, we find that OCM fully considered the impacts of the compressor station in granting the permit. Healthy Gulf's argument on this issue is without merit.

2. **Did alternative sites with lesser impacts preclude the issuance of permits for the chosen sites?**

Healthy Gulf argues that the primary selected sites for both projects did not avoid adverse impacts "to the maximum extent practicable" and the costs outweighed the benefits because alternative sites would have avoided impacts to the Coastal Zone. Healthy Gulf notes that one of the alternative sites for the terminal was almost entirely outside the Coastal Zone. This site would have eliminated the need for a pipeline in the zone. When a proposed project cannot eliminate the delineated adverse effects to the maximum extent possible, it must show that no other "feasible and practical alternative location[]" exists that would avoid these impacts. La.Admin.Code. tit. 43, Pt. I, § 701(H)(1).

OCM's "Basis of Decision" stated that throughout the permitting process and at the public hearing, it heard concerns that it did not have adequate information on alternative terminal and pipeline sites, that Venture Global presented false and unequal comparisons to justify the proposed primary sites, and that Venture Global failed to fully compare the advantages and disadvantages of the alternative sites. OCM said it gave full consideration to these comments.

Venture Global's permit application reflected that the primary terminal site consists of habitat previously disturbed by oil and gas exploration and extraction, fill activities, cattle grazing, hay crop production, and other agricultural practices.

Venture Global further stated that wetland delineations performed at the primary terminal site were of lower quality due to a history of human disturbance.

OCM analyzed route length, route length through wetlands and other habitats, and the number of roads crossed, finding that the alternatives did not provide any significant environmental advantage. It found that the approved pipeline route avoided crossing the Sabine National Wildlife Refuge, public oyster seed grounds in Calcasieu Lake, and the Cameron-Creole Watershed Levee. This was not true for alternative sites.

The first alternative site affected four times the estuarine wetlands (as mapped by the National Wetlands Inventory). For this site, the vessel transit time for ships taking liquified natural gas from the terminal would be increased to eight or nine hours instead of the three hours for the selected site. The increased transit time would increase environmental impacts from additional vessel emissions. The second alternative site overlapped the first, so it had similar issues with increased transit time. It also impacted more wetlands than the primary site and impacted forestland (which the selected site did not). Also, because the second site was at the intersection of the Industrial Canal and the Calcasieu Ship Channel, it presented marine safety and maneuverability challenges absent from the primary site. The third alternative site would have affected more than five times as many acres of estuarine wetlands. Also, the required pipeline route for this site would have been adjacent to more residential and commercial areas and would have crossed federal and state wildlife preserves and refuges.

Healthy Gulf claims that two alternative sites for the terminal would have utilized less land in the coastal zone and therefore avoided more coastal zone impacts. Yet the three alternative sites impacted larger areas of wetlands than the permitted terminal site and had other disadvantages. Healthy Gulf's interpretation of

the guidelines injects an element of arbitrariness, ignoring the need to balance multiple factors. Healthy Gulf argues that if it is at all possible to force the environmental impacts outside the coastal zone, then OCM should not grant the permit. This is a misreading of the statutes and guidelines.

Such an interpretation violates the public policy in the State and Local Coastal Resources Management Act which "[r]ecognize[s] the value . . . [of] areas particularly suited for industrial, commercial, or residential development and manage those areas so as to enhance their value to the people of Louisiana." La.R.S. 49:214.27(C)(4). Also, it ignores the public policy "[t]o support . . . the need to provide for adequate economic growth and development and the minimization of adverse effects of one resource use upon another, and without imposing any undue restriction on any user." La.R.S. 49:214.22(3).

The Coastal Resources Management Act and the guidelines are not purely environmental protection and resource conservation laws. It would always be true that choosing an alternative site outside of the Coastal Zone would avoid impacts on the zone. But this is not the only consideration. The permitting guidelines address specific delineated impacts, not *every* impact. And the impacts are weighed against the economic benefits, since the Act also aims to promote economic development.

Consequently, the evidence in the record, as well as the OCM's analysis of the alternative sites in its "Basis of Decision," demonstrate that it was not arbitrary and capricious in finding that the selected sites avoided certain impacts to the maximum extent practical, or where not feasible, the benefits outweighed the costs. Therefore, OCM's issuance of the permits was not arbitrary and capricious. We find Healthy Gulf's argument on this issue lacks merit.

13

### 3. Did OCM fail to weigh the impact to fishermen?

Healthy Gulf argues that the Coastal Use Guidelines in La.Admin.Code. tit. 43, Pt. I, § 701 prohibit granting the permit unless the project avoids adverse impacts to other Coastal Zone users such as commercial fishermen, or OCM finds that the costs of unavoidable impacts are "clearly outweigh[ed]" by project benefits and that "no feasible and practical alternative . . . methods and practices" would avoid those impacts. Healthy Gulf argues that OCM did not conduct its own analysis and instead relied on FERC's review discussing potential impacts to commercial fishermen but did not detail a mitigation plan.

Specifically, the relevant guidelines state that they shall have the goal to, "Minimize, whenever feasible and practical, detrimental impacts on . . . fisheries by such means as encouraging minimum change of natural systems and by multiple use of existing canals . . . and other practical techniques." La.R.S. 49:214.27(C)(5).

Further, they require that the project "avoid to the maximum extent practicable **<u>significant</u>** . . . adverse economic impacts on the locality of the use and affected governmental bodies[.]" La.Admin.Code. tit. 43, Pt. I, § 701(G)(2) (emphasis added). Lastly, mitigation is required as a condition for granting the permit when there is "any net loss of coastal resources ecological value that is anticipated to occur despite efforts to avoid, minimize, and restore permitted/authorized impacts (i.e., unavoidable net loss of coastal resources ecological value), unless a variance is granted pursuant to § 724.K." La.Admin.Code. tit. 43, Pt. I, § 724(B)(1)(c).

Critically, the statutes and guidelines contain multiple qualifiers that Healthy Gulf's argument fails to emphasize. According to public policy and guidelines, adverse impacts are to be minimized only where feasible and practical, and avoided only where significant. Mitigation is required only when there is a "net loss of coastal resources ecological value." This is different from an adverse economic effect.

14

FERC's review summarized impacts on commercial fishing stating:

Recreational and commercial fishing could be impacted by construction activities associated with the Project, primarily with the Terminal Facilities. Project activities are anticipated to occur during peak fishing . . . seasons, therefore, temporary impacts on . . . commercial users in the Calcasieu Ship Channel, which would likely include individuals from environmental justice communities, may occur in areas where construction is occurring. However, fishing activities are not restricted to the relatively small sections of the Project footprint that could provide potential fishing opportunities and due to the overall size of the waterway and the bay, access to and maneuverability within the Calcasieu Ship Channel would not be significantly affected by the use of barges . . . The construction impacts on . . . commercial fisheries would be temporary, lasting the duration of construction activities. Permanent impacts on recreational and commercial fisheries in the ship channel . . . may occur due to the loss of available fishing areas from operation of the Marine Facilities and LNG carrier traffic. Based on consultations between FERC and [Louisiana Department of Wildlife and Fisheries (LDWF)], impacts on shrimping vessels would be greatest near the Terminal south of the Firing Line where shrimping occurs year-round and vessel traffic and dredging associated with the Terminal Facilities would occur. Although we expect fish, crab, and shrimp species common to the bay could be present, the location does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location. The Project area does not support special habitat that is different from the miles of surrounding habitat. **Given these characteristics, and due to the overall size of the waterway, we conclude that these impacts . . . would not be significant.** Additionally, Venture Global created the Calcasieu Pass Community Advisory Group to ensure that residents from all parts of Cameron Parish are represented and can communicate promptly and directly with Venture Global to express any concerns they have or to communicate adverse impacts that they or their neighbors have seen related to Calcasieu Pass. As part of the Community Advisory Group and as part of their general community relations, CP2 LNG states it would continue to seek stakeholder feedback and work with stakeholders, including shrimpers and fishermen, on ways that negative impacts may be avoided or mitigated. [emphasis added].

After consideration of all the data, concerns, and analysis, FERC concluded that the operations and construction impacts of the project "would not have a significant impact on commercial [or recreational] fisheries." FERC's environmental impact statement concluded: "impacts on aquatic resources from construction of the Terminal Facilities would not be significant," and that "in

15

consultation with NMFS, we conclude that the overall impacts on fish would not be significant."

Elsewhere, FERC concluded, "[D]ue to the overall size of the waterway and access to and maneuverability within the Calcasieu Ship Channel, fishing and recreational activities would not be significantly affected by the proposed use of barges."

Also, FERC explained:

> After the LNG transit is complete, fishing vessels could resume fishing activities throughout the Ship Channel. Typically, shrimp are most active at night when few vessels are using the Calcasieu Ship Channel. Given the Terminal Facilities proximity to the mouth of the Calcasieu River (about 1 mile) and the year-round use of the area by commercial fishing vessels, we conclude the increase in delays associated with LNG carrier transit would have a moderate, but not significant impact on commercial fishing.

Louisiana Administrative Code title 43, Part I, § 701(G) requires that the project avoid "to the maximum extent practicable significant . . . adverse economic impacts[.]" The record contains evidence that the disruption to the local fishing industry will not be significant, and even if it were, the impacts are being avoided to the maximum extent practicable. Therefore, on this issue we find that OCM did not act arbitrarily or capriciously.

**4. Did OCM owe a separate public trust duty under La.Const. art. 9, § 1?**

Healthy Gulf argues that OCM's decision violated the Louisiana Constitution because it failed to give "full and careful consideration" to environmental, economic, and social impacts. These impacts are raised in Healthy Gulf's other arguments. This argument seeks to apply different law to the same issues raised above.

The Coastal Resources Management Act and the guidelines governing the issuance of coastal use permits are examples of legislation that seeks to fulfill the aspirations of Louisiana Constitution Article 9, § 1. Like the guidelines, the

16

Louisiana Constitution does not require environmental protection at all costs, but rather "insofar as possible and consistent with the health, safety, and welfare of the people." We find the "welfare of the people" includes economic development in conjunction with preservation of resources. Further, we do not find the regulations in the Coastal Resources Management Act or the guidelines to be any less stringent or demanding than the public policy outlined in the Louisiana Constitution. Therefore, Healthy Gulf's argument is duplicative and addressed by our analysis above.

## CONCLUSION

After consideration of the arguments and review of the record, we find that OCM did not act arbitrarily or capriciously in granting the permits at issue.

## DECREE

The decision of the Louisiana Department of Natural Resources, Office of Coastal Management's granting of coastal use permits to Venture Global is affirmed. Costs are assessed to Appellants, Healthy Gulf for a Better Bayou, Fisherman Involved in Sustaining our Heritage, Habitat Recovery Project, Louisiana Bucket Brigade, Micah 6:8 Mission, and Sierra Club.

**AFFIRMED.**